CAUFF, LIPPMAN & CO., and Arthur J. Bernstein d/b/a Amber International, Plaintiffs,

v.

The APOGEE FINANCE GROUP, INC., David Gould and Richard Cosse, Defendants.

No. 90 Civ. 5970 (CBM).

United States District Court, S.D. New York.

Aug. 7, 1992.

Alan Kluger, Steve I. Silverman, Kluger, Peretz, Kaplan & Berlin, P.A., Miami, Fla., for plaintiffs.

Joel B. Harris, Karen J. Pordum, Thacher Proffitt & Wood, New York City, for defendants.

### OPINION

MOTLEY, District Judge.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The dispute in this case concerns an agreement entered into between plaintiff CAUFF, LIPPMAN & CO. ("CAUFF, LIPPMAN") and defendant THE APOGEE FINANCE GROUP, INC. ("APOGEE") on January 9, 1990, and APOGEE's alleged failure to perform under this agreement. CAUFF, LIPPMAN seeks $1,999,998.00 in compensatory damages resulting from APOGEE's breach of contract.[1] Plaintiff ARTHUR J. BERNSTEIN ("BERNSTEIN") d/b/a AMBER INTERNATIONAL ("AMBER") also sues APOGEE for breach of contract as a third-party beneficiary of the agreement. BERNSTEIN's third-party beneficiary claim is derivative of CAUFF, LIPPMAN's breach of contract action against APOGEE. In the event that they do not recover damages on their breach of contract claims, plaintiffs alternatively seek recovery in quantum meruit for the reasonable value of services performed.

This action, which was tried to the court, began on June 1, 1992 and concluded on June 10, 1992. After reviewing all of the evidence in the case and weighing the testimony and exhibits received in evidence, the court now makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

### I. FINDINGS OF FACT

1. CAUFF, LIPPMAN is a Florida corporation engaged in the business of airplane brokerage. (Stipulated Fact 1).[2] CAUFF, LIPPMAN operates as a commercial jet aircraft lessor and is in the business of fleet-planning and world-wide consulting and financial planning for various airlines. (Tr. 19). Since its inception, CAUFF, LIPPMAN has handled in excess of one billion dollars in such transactions. (Tr. 20). CAUFF, LIPPMAN's principal place of business is Miami, Florida. (Stipulated Fact 1).

2. The principals of CAUFF, LIPPMAN are Stuart Cauff ("Cauff"), Chairman and President, and Wayne Lippman ("Lippman"), Vice–Chairman and Chief Operating Officer. (Stipulated Fact 2).

---

1. Although GOULD and COSSE are named as individual defendants in the amended complaint, plaintiffs' claims against GOULD and COSSE were dismissed at trial. (Tr. 688EEE, 688HHH, 688III).

2. References to "Stipulated Fact ——" are to the Agreed Findings of Fact set forth in the Joint Pre–Trial Order dated December 13, 1991.

3. BERNSTEIN is a Florida resident engaged in the business of financial consulting. (Stipulated Fact 3). BERNSTEIN, doing business as AMBER, has a principal place of business in Palm Beach County, Florida. (*Id.*). BERNSTEIN has over twenty years of experience in the aircraft leasing and corporate finance industries and has handled over five hundred fifty million dollars in aircraft financing since June of 1991. (Tr. 246–247). The court finds that BERNSTEIN is an expert in aircraft leasing and finance transactions.

4. APOGEE is a Delaware Corporation with its principal place of business in New York, New York. (Stipulated Fact 4). APOGEE was formed in the summer of 1989 by Koninklijke Luchtvaart Maatschappij NV, KLM Royal Dutch Airlines ("KLM"), a Netherlands company, for the following purposes: (1) to assist KLM and its affiliates in disposing of new surplus aircraft; (2) to assist KLM and its affiliates in disposing of old aircraft; (3) to utilize the expertise of the individuals at APOGEE to structure and arrange aircraft financing for KLM and its affiliates; and (4) to perform the foregoing functions for unrelated third-party airlines. (Stipulated Facts 4, 5; Tr. 804–807). APOGEE is a subsidiary of and approximately eighty percent owned by KLM. (Stipulated Fact 5). APOGEE is primarily engaged in the business of equipment leasing and financing. (*Id.*).

5. Defendant DAVID GOULD ("GOULD") is an individual residing in New York, New York, and is a Managing Director of APOGEE. (Stipulated Fact 6). GOULD was primarily responsible for negotiating the January 9, 1990 agreement between CAUFF, LIPPMAN and APOGEE. (Tr. 1126–27).

6. Defendant RICHARD C. COSSE ("COSSE") is an individual residing in Connecticut, and is a Managing Director of APOGEE and its Chief Executive Officer. (Stipulated Fact 7).

7. In the summer of 1989, KLM, APOGEE and a French airline, Air Littoral, S.A. ("Air Littoral") agreed that they would attempt to enter into a transaction whereby KLM would indirectly lease to Air Littoral six Fokker F–100 aircraft (the "Aircraft") through a series of United States and foreign-based purchase and lease transactions (the "overall transaction"). (Stipulated Fact 8). The structure of the overall transaction involved a series of intricate international transactions, and at one level contemplated the use of a United States financing source. (*Id.*).

8. As part of the overall transaction, APOGEE was also arranging a European financing transaction that would generate additional profit for APOGEE. Originally, the overall transaction contemplated the use of a French tax lease transaction. APOGEE later substituted a Japanese tax lease transaction for the French tax lease transaction. (Tr. 260, 881–82). The change in the tax lease transaction did not involve CAUFF, LIPPMAN or BERNSTEIN, and did not alter CAUFF, LIPPMAN's duties under the January 9, 1990 agreement. (Tr. 260).

9. KLM had several specific objectives in connection with the overall transaction, which were as follows: (1) to get the Aircraft out of KLM's fleet; (2) to generate cash and profit for APOGEE; (3) to enable Air Littoral to operate the Aircraft and sub-sublease the Aircraft in the world market place; and (4) to create cash flow for Air Littoral and capitalize its operations. (Tr. 24, 253, 808–810). KLM also wanted the transaction to be structured discretely, so that its capitalization of, and generation of profit for, Air Littoral would not be obvious to the outside world. (Tr. 1120–21).

10. One of APOGEE's roles in connection with the overall transaction was to participate in the United States portion of the transaction and to arrange for United States based financing. The U.S. financing portion of the transaction would compete with an offer that Air Littoral and KLM had received from a French-based institution, Banque Nationale de Paris ("BNP"), to finance Air Littoral's lease of the aircraft. (Tr. 857–58). The U.S. financing would therefore have to be the equivalent of or superior to the BNP offer. (Tr. 99; 857–59). As contemplated in the overall transaction, the United States financing

would enable APOGEE to purchase the Aircraft from KLM in order to effectuate the rest of the overall transaction whereby the Aircraft would eventually be leased to Air Littoral. (Stipulated Fact 8). Obtaining a U.S. funding source would also generate certain tax benefits in the overall transaction. (Tr. 861–62).

11. The transaction that gives rise to the present dispute is the United States financing portion of the overall transaction. (Stipulated Fact 8; Tr. 26–28).

12. Plaintiffs' involvement in the U.S. financing portion of the overall transaction began in August of 1989. On August 10, 1989, BERNSTEIN and GOULD had a telephone conversation in which GOULD described the overall transaction to BERNSTEIN and expressed KLM's desire to transfer the Aircraft to Air Littoral. GOULD asked BERNSTEIN whether he could secure financing for and structure the United States phase of the transaction, thereby allowing the overall transaction to proceed. (Tr. 249–251). GOULD requested that BERNSTEIN structure the overall transaction in such a way as to enable a party unaffiliated with KLM to take title to the Aircraft at some stage in the overall transaction in order to accomplish KLM's goals. (*Id.*). During this telephone conversation, BERNSTEIN recommended CAUFF, LIPPMAN as the unaffiliated company that could purchase and resell the Aircraft pursuant to KLM's requirement. (Tr. 251).

13. At the time of this telephone conversation, GOULD did not have a structure for the U.S. phase of the transaction, nor had he secured a U.S. financing source. (Tr. 250). As a result of this telephone conversation, BERNSTEIN understood that GOULD had asked him to structure and procure a financing source for the U.S. phase of the overall transaction. (Tr. at 251–52).

14. After BERNSTEIN's telephone conversation with GOULD on August 10, 1989, BERNSTEIN called Cauff and related the substance of the conversation to Cauff. (Tr. 21–22). Cauff informed BERNSTEIN that CAUFF, LIPPMAN would be interested in participating in the transaction if it met their economic needs. (Tr. 22).

15. Cauff and BERNSTEIN subsequently identified Credit Suisse as the financial institution that was the best suited to provide the U.S. financing for the overall transaction. (Tr. 25). BERNSTEIN had a pre-existing business relationship with Credit Suisse. (Tr. 109, 644).

16. In August of 1989, BERNSTEIN contacted Wallace Henderson ("Henderson"), assistant vice president of Credit Suisse, and informed him of the need for financing in the U.S. phase of the overall transaction. (Tr. 251–52, 643–44). Henderson indicated that Credit Suisse would be interested in providing financing for the U.S. phase of the transaction. (Tr. 252).

17. GOULD and BERNSTEIN met in New York City on August 28, 1989 to discuss the transaction. At this meeting, GOULD stated that KLM wanted to use the overall transaction to supply capital to Air Littoral and again stated that APOGEE was looking for a U.S. financing source for the U.S. phase of the transaction. (Tr. 252–54, 854). BERNSTEIN told GOULD that Credit Suisse was interested in providing the U.S. financing for the transaction. GOULD authorized BERNSTEIN to pursue further negotiations with Credit Suisse. (Tr. 252–53).

18. BERNSTEIN later met with Henderson and Eric Noyes ("Noyes") of Credit Suisse on August 28, 1989 to discuss Credit Suisse's role in supplying the financing for the U.S. portion of the overall transaction. (Tr. 254–55). Henderson and Noyes expressed an eagerness to proceed with the transaction and requested a term sheet indicating the structure of the transaction as soon as possible. (*Id.*). BERNSTEIN faxed to Henderson a term sheet which he had prepared, dated September 6, 1989. (Pl.Exh. 3).

19. During the initial stages of the discussions between APOGEE, BERNSTEIN, and CAUFF, LIPPMAN about the the U.S. financing for the transaction, it was understood by all of the parties involved that KLM would guarantee APOGEE's duties

and obligations in the U.S. phase of the overall transaction. (Tr. 257, 846, 855; Pl. Exh. 3).

20. BERNSTEIN, GOULD and Cauff next met on September 5, 1989 in Miami. GOULD stated that if CAUFF, LIPPMAN was to be involved in the transaction, it had to secure financing for the U.S. phase of the transaction on terms better than the financing already available to Air Littoral by BNP, the French-based lender. (Tr. 26, 28). At this meeting, GOULD discussed with Cauff and BERNSTEIN the terms of the proposed financing Air Littoral had received from BNP, and emphasized that APOGEE had to "match or beat" the French financing package in order to participate in the U.S. phase of the overall transaction. (Tr. 100–101, 630, 815–16).

21. Immediately following the Miami meeting, BERNSTEIN prepared various financing and lease schedules designed to provide GOULD with a proposed rental structure which would be salable to Credit Suisse and which would compete with the French financing already available to Air Littoral. (Tr. 255; Pl.Exhs. 2, 4). BERNSTEIN believed that these financing and lease schedules would be superior to the French financing and that Credit Suisse would agree to their structure. (Tr. 255–56). BERNSTEIN sent these schedules to GOULD, who then sent them to Air Littoral. Based on schedules prepared by BERNSTEIN and CAUFF, LIPPMAN, Air Littoral granted to APOGEE the exclusive right to arrange the financing of the Aircraft. (Tr. 44–49, 60–61, 257–59; Pl.Exhs. 2, 4, 7, 14, 237).

22. On September 15, 1989, a meeting was held in APOGEE's office to discuss the economics of the U.S. phase of the transaction and the parties' relative profit margins. (Tr. 31–32). Cauff, BERNSTEIN, Lippman, GOULD, COSSE, and several other representatives of APOGEE attended the September 15 meeting. (Tr. 31). At this meeting, the parties agreed that the purchase price of each of the six Aircraft would be $21,500,000.00, and that the lease term would be fifteen years. (Tr. 42–43, 257–59; Pl.Exhs. 6, 237).

23. Also at the September 15, 1989 meeting, CAUFF, LIPPMAN and APOGEE agreed that CAUFF, LIPPMAN would receive a profit of $1,999,998.00 for their role in the U.S. portion of the transaction, and that APOGEE's profit in the U.S. phase of the transaction would be $1,000,000.00. (Tr. 31–32, 55–59, 257, 259, 884; Pl.Exhs. 146, 241, 248). CAUFF, LIPPMAN's profit represents the difference between the price at which APOGEE was to sell each of the Aircraft to CAUFF, LIPPMAN ($22,166,-667.00) (the "sale price"), and the price at which APOGEE was to repurchase each of the Aircraft from CAUFF, LIPPMAN ($22,500,000.00) (the "repurchase price"). The difference between the sale price and the repurchase price is $333,333.00 per Aircraft, totaling $1,999,998.00 for all six Aircraft. (Tr. 55–56; Pl.Exhs. 146, 241, 248). Despite further negotiations and changes in the structure of the transaction, CAUFF, LIPPMAN's profit margin in the U.S. phase of the transaction never changed.

24. It was immaterial to APOGEE whether CAUFF, LIPPMAN used its own money to finance the transaction or obtained financing from another source in terms of the value CAUFF, LIPPMAN brought to the transaction and the profit CAUFF, LIPPMAN would receive. (Tr. 1189–92).

25. By the end of September, 1989, all of the essential terms of the contemplated transaction were acceptable to Credit Suisse and Credit Suisse was willing to proceed with finalizing the transaction. (Tr. 654–659). In early October of 1989, CAUFF, LIPPMAN and BERNSTEIN received a first draft of Credit Suisse's commitment letter which provided the basis for further negotiations with Credit Suisse. (Tr. 54).

26. KLM confirmed APOGEE's exclusive right to sell the Aircraft in a letter dated October 4, 1989. (Tr. 573–75; Pl. Exh. 14).

27. It was evident early in the negotiations with Credit Suisse that the proposed KLM guaranty was material to Credit Suisse's evaluation of the financing transaction. Accordingly, CAUFF, LIPPMAN

sent a proposed draft of a KLM guaranty to GOULD on October 12, 1989. (Tr. 54, 56–60, 262–63; Pl.Exh. 13).

28. On October 23, 1989, AMBER and CAUFF, LIPPMAN entered into an agreement whereby CAUFF, LIPPMAN agreed to pay AMBER a fee of one-half of one percent of the aggregate price of the Aircraft in connection with transactions in which BERNSTEIN acts as an agent. (D.Exh. T). The agreement makes payment of the fee contingent upon the actual closing of any given transaction. (*Id.*).

29. All parties agree that BERNSTEIN's fee for his services in connection with the U.S. financing portion of the overall transaction is derivative of CAUFF, LIPPMAN's fee, and was to be paid by CAUFF, LIPPMAN. (Tr. 321; Pl.Exh. 146; D.Exh. T).

30. On or around November of 1989, CAUFF, LIPPMAN was informed by GOULD that KLM had agreed to guarantee the transaction. (Tr. 61).

31. On November 29, 1989, CAUFF, LIPPMAN, BERNSTEIN, APOGEE, Credit Suisse and their respective counsel met in an attempt to finalize the documentation necessary to close the U.S. phase of the transaction. At the meeting, the parties discussed Credit Suisse's proposed commitment to finance the U.S. portion of the transaction. (Tr. 662–63). As of the November 29, 1989 meeting, there were no material disputed terms in Credit Suisse's proposed commitment. (Tr. 663–68).

32. During the November 29, 1989 meeting, the participants agreed to two changes in the structure of the U.S. phase of the transaction. The first was a change in the form of the transaction from KLM selling the Aircraft to APOGEE, APOGEE re-selling the Aircraft to CAUFF, LIPPMAN, and CAUFF, LIPPMAN then leasing the Aircraft back to APOGEE. Under the revised transaction, KLM would sell the Aircraft to APOGEE, APOGEE would re-sell the Aircraft to CAUFF, LIPPMAN, and CAUFF, LIPPMAN would then sell the Aircraft back to APOGEE. The second change was that the purchase price per Aircraft increased by $500,000.00, from $21,500,000.00 to $22,000,000.00 in re-

sponse to KLM's desire to increase the capital infusion to Air Littoral. (Tr. 55, 64–66, 267). The revised structure substituting the Japanese tax lease transaction for the French tax lease transaction was also discussed at the November 29, 1989 meeting. (Tr. 883).

33. At the time of the November 29, 1989 meeting, Credit Suisse believed, based on APOGEE's representations, that KLM would approve the U.S. phase of the overall transaction and provide the necessary guarantee. It was based on this representation that Credit Suisse was prepared to proceed with its role in providing the U.S. financing. (Tr. 665–66).

34. By the end of the November 29, 1989 meeting, the participants had agreed upon the roles of the parties and the structure of the U.S. phase of the overall transaction. Although Henderson expressed his belief that the structure of the transaction was unnecessarily complex, Credit Suisse was nevertheless prepared to proceed based on APOGEE's representation that KLM would guarantee the transaction. (Tr. 670–71; Pl.Exh. 213).

35. After the November 29, 1989 meeting, a revised proposed contract between APOGEE and CAUFF, LIPPMAN was drafted reflecting the change in structure from a sale/lease-back between APOGEE and CAUFF, LIPPMAN to a sale/sale-back, and the increase in the per Aircraft purchase price to $22 million. (Pl.Exh. 24). Each party's relative profit was unchanged. (Tr. 68–70). Pursuant to this revised proposed contract, the parties further agreed that an Aircraft Sales and Financing Agreement ("ASFA") would be the operative closing document for the U.S. phase of the overall transaction. (Tr. 70).

36. As a result of further negotiations and KLM's desire to provide additional capital to Air Littoral, in December of 1989, GOULD again requested an increase in Credit Suisse's total financing commitment in order to accommodate an increase of $500,000.00 in the purchase price for each Aircraft. The new purchase price per aircraft subsequently increased to $22,500,-000. (Tr. 71–74; Pl.Exhs. 25, 28).

37. Credit Suisse agreed to lend the additional funds necessary to complete the transaction and to provide a total loan to CAUFF, LIPPMAN of $141,000,000. (Tr. 75–78; Pl.Exhs. 29, 30). By December 10, 1989, APOGEE had provided Credit Suisse with sufficient information about the Japanese tax lease transaction for Henderson to continue to recommend that Credit Suisse proceed with the providing the U.S. financing for the transaction. (Tr. 673–74; Pl. Exhs. 23, 23A, 213).

38. On January 7, 1990, Credit Suisse prepared a commitment letter for execution by CAUFF, LIPPMAN. CAUFF, LIPPMAN executed the Credit Suisse commitment letter on January 9, 1990. (Tr. 78–79; Pl.Exh. 35).

39. GOULD initially refused to approve Credit Suisse's January 7, 1990 commitment letter because he found the provision regarding hull insurance unacceptable. Thereafter, pursuant to negotiations between CAUFF, LIPPMAN, BERNSTEIN and Credit Suisse, Credit Suisse agreed to delete the hull insurance provision to which GOULD had objected. (Tr. 80–81, 126, 44–41, 1013; Pl.Exhs. 35, 41).

40. After Cauff informed GOULD that the hull insurance provision would be deleted from the Credit Suisse commitment letter, APOGEE determined that the January 9, 1990 contract with CAUFF, LIPPMAN was acceptable and executed the contract on January 10, 1990. (Tr. 81–83, 440–41; Pl.Exh. 146). Prior to APOGEE's execution of the January 9, 1990 contract, GOULD told BERNSTEIN that KLM had approved the U.S. phase of the overall transaction and would guarantee it. (Tr. 339). CAUFF, LIPPMAN and BERNSTEIN believed and reasonably relied upon GOULD's representations regarding KLM's approval and guarantee of the transaction. (Tr. 340–41).

41. The parties instructed their attorneys to prepare the revised final documentation necessary to close the transaction set forth in the January 9, 1990 contract. As of January 10, 1990, Credit Suisse had no reason to believe that the transaction would not proceed as set forth in the Credit Suisse commitment letter and in the CAUFF, LIPPMAN/APOGEE contract. (Tr. 680–81). A meeting was scheduled for January 16, 1990 between CAUFF, LIPPMAN, APOGEE, Credit Suisse and their respective counsel to review the documentation and conclude the transaction. (Tr. 85, 280, 682; Pl.Exh. 49). It was understood that APOGEE would negotiate the conditions of the KLM guarantee on behalf of KLM at the January 16, 1990 meeting. (Tr. 683).

42. Credit Suisse brought to the January 16, 1990 meeting a revised commitment letter which did not include the hull insurance provision that APOGEE had found objectionable. (Tr. 133, 1017–18; Pl.Exhs. 35, 41, 50). Drafts of the closing documents, including the ASFA, security agreements, loan agreements, KLM guaranty and other relevant documents were also brought to the January 16, 1990 meeting. (Tr. 85–86, 280, 685; Pl.Exhs. 147, 148, 149, 150; D.Exh. I).

43. CAUFF, LIPPMAN, BERNSTEIN, APOGEE, Credit Suisse and their respective counsel were reviewing the documentation at the January 16, 1990 meeting when APOGEE sought to re-negotiate the indemnification provisions in Credit Suisse's commitment letter. (Tr. 149). Henderson of Credit Suisse then suggested that the structure of the transaction could be simplified if Credit Suisse made a direct loan to APOGEE rather than loan the funds to CAUFF, LIPPMAN, who in turn would have a financing relationship with APOGEE. (Tr. 87, 150, 280–81, 474, 688B–688D). Henderson explained that he envisioned his proposed change as one which would lower legal fees, streamline the necessary documentation and simplify the structure of the U.S. transaction. (Tr. 88, 280, 688B–688C). Credit Suisse never suggested, however, that it would not proceed with the financing transaction as originally structured with CAUFF, LIPPMAN in the January 9, 1990 agreement. (Tr. 475; D.Exh. Z).

44. CAUFF, LIPPMAN responded that it would be willing to accommodate Henderson's suggestion, but expressly conditioned any change in the structure of the

transaction upon its receipt of the fee set forth in the January 9, 1990 agreement. CAUFF, LIPPMAN further conditioned any changes in the January 9, 1990 agreement upon the understanding that if the parties for any reason chose not to proceed under the new structure, then the January 9, 1990 Agreement would control and the parties would revert to the structure set forth therein. (Tr. 240, 281, 476, 688B–688C, 934–35). At no time during the meeting did CAUFF, LIPPMAN agree to abandon or lower the fee previously agreed to in the January 9, 1990 contract. (Tr. 87, 281, 561–62, 688D–688E).

45. At this point during the January 16, 1990 meeting, GOULD requested a private meeting with BERNSTEIN, Cauff and Lippman. BERNSTEIN, Cauff, Lippman and GOULD met privately in the hall, at which time GOULD indicated that he would "look like shit to KLM if [APOGEE had] to write [CAUFF, LIPPMAN] a check for a $2 million fee." (Tr. 87–88, 281, 480, 934). In response, CAUFF, LIPPMAN told GOULD that it would not accept a lesser fee than that previously agreed upon in the January 9, 1990 contract, and reiterated that if GOULD did not want to change the structure of the transaction, CAUFF, LIPPMAN was ready, willing and able to conduct the transaction as contemplated in the January 9, 1990 contract. (Tr. 88–89, 281, 491–92, 934–35).

46. During this private meeting, GOULD assured CAUFF, LIPPMAN and BERNSTEIN that they would be fully protected in the transaction. Based on that representation, CAUFF, LIPPMAN, BERNSTEIN and GOULD returned to the meeting and instructed their lawyers to redraft the documents based upon the direct financing proposed by Credit Suisse. (Tr. 492). From that point forward in the meeting, the Credit Suisse loan documents were discussed and approved by APOGEE without further objection by GOULD. (Tr. 282, 493, 527, 683–87; D.Exh. Z).

47. At the January 16, 1990 meeting, Henderson also indicated that Credit Suisse was ready, willing and able to proceed with the transaction either as originally proposed, or as he suggested at the meeting. Nothing occurred at the January 16, 1990 meeting to cause Credit Suisse to withdraw its commitment to go forward with its role of providing the necessary financing for the U.S. portion of the overall transaction. (Tr. 530–31, 683–85; D.Exh. Z). It was Henderson's understanding at the close of the January 16, 1990 meeting that the U.S. phase of the transaction was proceeding toward closure. (Tr. 687–88).

48. At the conclusion of the January 16, 1990 meeting, the parties instructed their counsel to prepare the revised documentation providing for a direct loan between APOGEE and Credit Suisse. (Tr. 282, 936, 981–82). The parties and their counsel agreed that the revised documentation would be ready on January 18, 1990, and a meeting was scheduled for that day at 9:00 a.m. to review and approve the revised documents. (Tr. 88, 981–82).

49. BERNSTEIN, Cauff, and Lippman appeared as scheduled for the meeting on January 18, 1990, but were informed that APOGEE had cancelled the meeting. They were further informed that the revised documentation had been prepared as requested and were provided with copies. (Tr. 89, 283).

50. Cauff then telephoned GOULD, and GOULD and Cauff agreed to schedule a meeting for later that day in APOGEE's offices. Cauff, GOULD, BERNSTEIN, Lippman and COSSE were present at the meeting. (Tr. 89–90, 283–84).

51. At this meeting on January 18, 1990, GOULD stated that he would not complete the transaction with Credit Suisse as the lender unless CAUFF, LIPPMAN agreed to reduce its profit. (Tr. 241–42, 506–509, 512, 982, 985–86, 1104). GOULD then showed plaintiffs a telephone message slip from the Yasuda Trust & Banking Company ("Yasuda"), and stated that APOGEE would abandon its agreement with CAUFF, LIPPMAN and obtain direct financing from Yasuda unless CAUFF, LIPPMAN agreed to accept less money in the transaction. (Tr. 90). APOGEE then offered CAUFF, LIPPMAN $700,000.00 (*Id.*). Cauff rejected the offer, stating that APOGEE had executed a contract and that plaintiffs had spent months negotiating

and structuring the transaction and were entitled to the $1,999,998.00 fee set forth in the January 9, 1990 contract. (Tr. 90–91).

52. On January 18, 1990, CAUFF, LIPPMAN and Credit Suisse remained ready, willing and able to proceed with the transaction as contemplated in the January 9, 1990 contract documents. (Tr. 90–92, 240–42, 283–84, 1077, 1173; Pl.Exhs. 56, 59).

53. On January 19, 1990, APOGEE increased their offer to CAUFF, LIPPMAN to $750,000.00. CAUFF, LIPPMAN rejected this offer. (Tr. 287). Also on January 19, 1990, Apogee Finance Group—Group Air Littoral ("AFG–GAL") was incorporated as a special purpose bankruptcy-remote corporation. (Tr. 304, 526–27; Pl.Exh. 127). AFG–GAL was set up by APOGEE to receive the Yasuda loan proceeds. (Tr. 304; Pl.Exh. 130).

54. On January 23, 1990, CAUFF, LIPPMAN wrote to COSSE, reiterating CAUFF, LIPPMAN's and Credit Suisse's willingness and ability to proceed with the transaction pursuant to the January 9, 1990 Agreement. (Pl.Exh. 154).

55. APOGEE and CAUFF, LIPPMAN had no subsequent discussions and the United States portion of the overall transaction ultimately closed in February of 1990 with Yasuda as lender and AFG–GAL as borrower.

56. CAUFF, LIPPMAN at all times made it clear that it would not agree to a reduction in the fee agreed upon in the January 9, 1990 agreement, and that it remained willing to proceed with the transaction as originally structured. (Tr. 1198).

57. The United States phase of the transaction closed on the same or substantially similar terms and conditions as those set forth in the CAUFF, LIPPMAN/APOGEE January 9, 1990 contract and Credit Suisse loan documents, the only material difference being CAUFF, LIPPMAN's profit margin. (Tr. 96, 287–97, 308–311, 1035–1039; Pl.Exhs. 64, 146).

58. APOGEE claims that CAUFF, LIPPMAN and BERNSTEIN never fulfilled the four conditions precedent in the January 9, 1990 agreement. Conversely, plaintiffs claim that each of the conditions precedent were either fulfilled or should be deemed waived or excused because performance of the conditions was prevented by APOGEE.

59. The first condition precedent required the negotiation and execution of the ASFA and other documentation customary in such a transaction. (Pl.Exh. 146). Although these documents were not executed (Tr. 200, 518), plaintiffs were wrongfully prevented from fulfilling this condition by APOGEE's cancellation of the meeting scheduled for January 18, 1990, at which time final negotiation and execution of the documents was to occur. (Tr. 88, 200, 518, 687, 981).

60. The second condition precedent to the January 9, 1990 agreement was the sale and delivery of the Aircraft pursuant to the schedule set forth in the contract. (Pl.Exh. 146). As of January, 1990, this condition was not fulfilled. (Tr. 200, 524–25). APOGEE similarly prevented the performance of this condition by cancelling the January 18, 1990 meeting and preventing the necessary documents from being executed. The Aircraft were subsequently delivered during the U.S. phase of the overall transaction which was finally consummated with Yasuda substituting for Credit Suisse as the lender. (Tr. 314–315, 1208).

61. The third condition precedent set forth in the January 9, 1990 agreement required CAUFF, LIPPMAN to procure a loan commitment for financing the U.S. phase of the overall transaction on terms and conditions satisfactory to APOGEE. (Pl.Exh. 146). Despite GOULD's representations to the contrary (Tr. 926–28), the court finds that a preponderance of the credible evidence demonstrates that the terms of the loan commitment from Credit Suisse were satisfactory to APOGEE in all material respects.

62. Cauff, BERNSTEIN and Henderson all testified that GOULD had no significant objections to the terms of the Credit Suisse commitment letter that were not cured at the January 16, 1990 meeting. (Tr. 88, 282, 530–31, 680–81, 683–87, 981–82; Pl.Exhs. 35, 41, 50). APOGEE planned to finalize the Credit Suisse financing arrangement

when GOULD scheduled the January 18, 1990 meeting, and instructed APOGEE's counsel to prepare the revised loan documents. (Tr. 176–77, 282, 687, 936, 981). If APOGEE had found the terms of Credit Suisse's loan commitment unacceptable, GOULD would not have instructed APOGEE's counsel to revise the loan documents in accordance with the negotiations that occurred on January 16, 1990, nor would he have scheduled the January 18, 1990 meeting to finalize the revised documents.

63. GOULD and COSSE remained willing to proceed with the Credit Suisse financing several days after the January 16, 1990 meeting as long as CAUFF, LIPPMAN agreed to a reduction in its profit established in the January 9, 1990 agreement. (Tr. 241–42, 506–509, 512, 985–86, 1104). In fact, after the negotiations with CAUFF, LIPPMAN broke down, APOGEE contacted Henderson and requested that Credit Suisse provide the U.S. financing directly to APOGEE without CAUFF, LIPPMAN's involvement. (Tr. 284).

64. APOGEE indicated its acceptance of the terms of the Credit Suisse commitment letter after the hull insurance provision was deleted by signing the January 9, 1990 agreement. GOULD had indicated that APOGEE was not willing to sign that agreement unless and until an acceptable loan commitment was in place. (Tr. 336–37, 532–33).

65. GOULD testified that the January 7, 1990 Credit Suisse commitment letter was unacceptable because it allowed Credit Suisse to review the Japanese lease documents. GOULD claims that the structure of the overall transaction was "extraordinarily sensitive and proprietary" and that APOGEE and their Japanese business partners did not want Credit Suisse to have access to the Japanese tax and lease documentation. (Tr. 843). GOULD indicated at trial that this was his largest and most serious concern about the terms of the Credit Suisse commitment letter. (Tr. 843–44, 910). The court finds this testimony unpersuasive for three reasons. First, APOGEE had previously provided the Japanese term sheet and leasing documents to Credit Suisse, CAUFF, LIPPMAN and

BERNSTEIN in late November of 1989. (Tr. 449–50, 1070–71, Pl.Exhs. 23, 23A, 213). Second, Japanese tax leases were a well-known and practiced technique in the aircraft finance industry at the time APOGEE allegedly found the Credit Suisse term sheet unacceptable. (Tr. 1065). Third, the last revised commitment letter drafted by Credit Suisse deletes the requirement that Credit Suisse be allowed to review the Japanese lease documents and substitutes a requirement that APOGEE and KLM provide a representation that no terms of the Japanese lease transaction are adverse to Credit Suisse. (Tr. 463; Pl. Exhs. 35, 41, 50).

66. The financing commitment that APOGEE received from Yasuda was identical or substantially similar to the one previously proposed by Credit Suisse. (Tr. 688E–688F). The commitment letter APOGEE received from Yasuda is dated January 29, 1990, only ten days after discussions between APOGEE and CAUFF, LIPPMAN ended. (Tr. 297; Pl.Exh. 64). By January 22, 1990, as a result of a previous inquiry from APOGEE, Yasuda's Los Angeles office had already prepared documentation summarizing the terms and conditions of the proposed financing APOGEE was seeking. (Tr. 688AAA–688BBB; Pl. Exh. 196). The Yasuda commitment letter of January 29, 1990 substantially copies the financing and structure of the overall transaction developed by CAUFF, LIPPMAN and BERNSTEIN. The relevant terms of the Yasuda and Credit Suisse loan documents and commitment letters are substantially similar in all material respects. (Tr. 288–97, 440–42, 446–47, 451–52, 1015–19, 1024, 1035–42; Pl.Exhs. 50, 64, 65, 87, 91, 147, 148, 149, 150; D.Exh. I). In fact, the Yasuda/APOGEE term sheet and the CAUFF, LIPPMAN/APOGEE term sheet even contain the same typographical error. (Tr. 1035; Pl.Exhs. 64, 146).

67. The amount of the Yasuda financing, with negative amortization, was the same as the Credit Suisse proposed financing, taking into account the smaller amount financed because of the savings APOGEE realized by not performing its January 9, 1990 agreement with CAUFF, LIPPMAN.

(Tr. 406–417). By not proceeding under the January 9, 1990 contract with CAUFF, LIPPMAN and securing financing from Yasuda, APOGEE generated a savings of $205,000.00 per aircraft, or a total savings of $1,230,000.00 in the U.S. phase of the transaction. (Tr. 312–14, 609–611, 1048; Pl.Exh. 248).

68. APOGEE acted in bad faith by cancelling the January 18, 1990 meeting and refusing to further negotiate the terms of the Credit Suisse financing commitment pursuant to the structure set forth in the January 9, 1990 agreement. Credit Suisse was highly interested in providing the financing for the U.S. phase of the overall transaction. (Tr. 985–86). The fact that the Credit Suisse loan commitment letter required further negotiation to finalize the documents was not a good faith reason for refusing to proceed with the deal. It is not uncommon for such transactions to require numerous meetings and revisions of proposed documents, and the first draft of a loan agreement often differs vastly from the final financing documents. (Tr. 984–85, 1042). GOULD acknowledged that APOGEE's negotiations with Yasuda were "difficult". (Tr. 984).

69. APOGEE would have continued to negotiate with Credit Suisse in an attempt to finalize the documentation if CAUFF, LIPPMAN had agreed to reduce their compensation. (Tr. 982, 985–86, 1104). APOGEE's purported justification for the reduction in CAUFF, LIPPMAN's fee was that if CAUFF, LIPPMAN stepped out of the chain of title in the transaction, as suggested by Credit Suisse at the January 16, 1990 meeting, then the business risks assumed by CAUFF, LIPPMAN would be materially altered and CAUFF, LIPPMAN would deserve less compensation. In fact, however, the proposed change in CAUFF, LIPPMAN's role in the transaction would not have materially changed CAUFF, LIPPMAN's risks, duties and obligations as structured in the January 9, 1990 agreement. The Credit Suisse loan to CAUFF, LIPPMAN was non-recourse, guaranteed by KLM, and would be received by a special purpose bankruptcy-remote corporation formed by CAUFF, LIPPMAN. (Tr. 1025–28, 1030–35, 1198–1203).

70. The fourth condition precedent in the January 9, 1990 agreement required KLM's Supervisory Board to approve the transaction. It was APOGEE's duty and responsibility to seek KLM Supervisory Board approval for the transaction. (Tr. 573). APOGEE argues that it did not breach its duty to seek KLM Supervisory Board approval because the transaction was not ready for submission to KLM's Supervisory Board and would not have been approved. The court disagrees and finds that APOGEE acted in bad faith in declining to take the necessary steps to obtain KLM Supervisory Board approval.

71. In order to secure KLM Supervisory Board approval, APOGEE had to interface with the "Holdings Department" of KLM. (Tr. 631). Kees Voormolen ("Voormolen") was the liaison in KLM's Holdings Department between KLM and APOGEE. (Tr. 757, 759). To obtain KLM's Supervisory Board approval for a transaction, APOGEE had to recommend the transaction to Voormolen and obtain Voormolen's consent to the basic terms and conditions of the transaction. (Tr. 633, 761). Voormolen would then obtain recommendation for the transaction from the Holdings Department, which would submit the transaction to the Executive Board, which would then submit the transaction to the Supervisory Board for approval. (Tr. 633–34, 724, 761, 1262).

72. GOULD never recommended the transaction to Voormolen at the Holdings Department for KLM Supervisory Board approval. (Tr. 579, 639). The reason that GOULD did not submit the transaction to the Holdings Department for approval was because he thought that the amount of CAUFF, LIPPMAN's compensation agreed to in the January 9, 1990 contract was excessive and would not be approved by KLM. (Tr. 575–80, 633–34, 636–37, 688F–688G).

73. GOULD, Voormolen and COSSE testified that KLM had problems with the amount of compensation CAUFF, LIPPMAN would earn under the structure set forth in the January 9, 1990 agreement. (Tr. 767–68, 942–43, 1162). However, GOULD made no attempt to reduce

CAUFF, LIPPMAN's fee until January 16, 1990, after APOGEE had already executed the January 9, 1990 agreement setting CAUFF, LIPPMAN's compensation at approximately $2 million. (Tr. 687–88, 990–91). Moreover, GOULD did not disclose to CAUFF, LIPPMAN, BERNSTEIN, or Credit Suisse the fact that KLM objected to CAUFF, LIPPMAN's level of compensation. (*Id.*). In fact, GOULD repeatedly represented to CAUFF, LIPPMAN, BERNSTEIN and Credit Suisse that KLM had approved the transaction and would guarantee it. (Tr. 202, 244–45, 531–32, 544, 665–66; Pl.Exh. 213; D.Exh. Z).

74. Any problems KLM may have had with the amount of CAUFF, LIPPMAN's compensation agreed to in the January 9, 1990 agreement do not diminish APOGEE's responsibility to seek KLM Supervisory Board approval, nor do they relieve APOGEE's obligations under the contract. If in fact KLM would not have approved CAUFF, LIPPMAN's compensation as agreed to in the January 9, 1990 contract, APOGEE's execution of the January 9, 1990 contract notwithstanding KLM's problems with that level of compensation, coupled with GOULD's representations to CAUFF, LIPPMAN, BERNSTEIN and Credit Suisse that KLM had approved the transaction, for the apparent purpose of securing the assistance of BERNSTEIN and CAUFF, LIPPMAN in structuring and financing the transaction, constitutes bad faith and concealment on the part of APOGEE. Moreover, COSSE testified that KLM would have approved the transaction set forth in the January 9, 1990 contract if the deal had closed despite the problems KLM may have had with CAUFF, LIPPMAN's level of compensation under the January 9, 1990 agreement. (Tr. 1167–68). Consequently, the court finds that APOGEE acted in bad faith in connection with its responsibility to seek KLM Supervisory Board approval.

75. At APOGEE's request, KLM's Supervisory Board eventually approved and guaranteed the U.S. phase of the overall transaction wherein Yasuda provided financing to APOGEE in the amount of approximately $140,250,000.00. (Tr. 535, 603, 688Y, 688KK–688LL, 762, 782, 793–94).

The Yasuda/APOGEE financing closed on February 23, 1990. (Tr. 688UU–688VV).

76. Plaintiffs have also proven, by a fair preponderance of the credible evidence, their claim for quantum meruit recovery. Plaintiffs have demonstrated through expert testimony that a reasonable fee for the services performed by plaintiffs would be $1.4 million. (Tr. 328–29, 548–49).

## II. CONCLUSIONS OF LAW

1. CAUFF, LIPPMAN brings this action against APOGEE for damages resulting from APOGEE's breach of the January 9, 1990 contract with CAUFF, LIPPMAN. BERNSTEIN sues APOGEE as a third-party beneficiary of the CAUFF, LIPPMAN/APOGEE contract. BERNSTEIN's claim for damages under this theory is derivative of CAUFF, LIPPMAN's breach of contract claim, and neither CAUFF, LIPPMAN nor BERNSTEIN seek double recovery under the contract.

2. Defendants argue that BERNSTEIN cannot maintain an action for breach of the January 9, 1990 agreement between APOGEE and CAUFF, LIPPMAN because BERNSTEIN is not an intended third-party beneficiary of the agreement. The court disagrees.

3. A person who is not a party to the contract may bring an action for breach of contract if she or he is an intended beneficiary, and not merely an incidental beneficiary of the contract. *Banque Arabe et Internationale D'Investissement v. Bulk Oil (U.S.A.), Inc.*, 726 F.Supp. 1411, 1415 (S.D.N.Y.1989). New York courts have adopted the test for intended beneficiaries set forth in the Restatement (Second) of Contracts. *Lake Placid Club Attached Lodges v. Elizabethtown Builders, Inc.*, 131 A.D.2d 159, 521 N.Y.S.2d 165, 166 (3d Dep't 1987); *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38, 44–45, 495 N.Y.S.2d 1, 485 N.E.2d 208 (1985). Section 302 of the Restatement provides that a third party is an intended beneficiary if:

recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

Although the parties' intention to benefit the third party must be gleaned from the face of the contract, *In re Gulf Oil/Cities Service Tender Offer Litigation*, 725 F.Supp. 712, 733 (S.D.N.Y.1989), the defendant's obligation to the third-party beneficiary need not be explicitly stated in the contract itself. *Vista Co. v. Columbia Pictures Industries, Inc.*, 725 F.Supp. 1286, 1296 (S.D.N.Y.1989).

4. The circumstances in this case indicate that the parties intended BERNSTEIN to be a third-party beneficiary of the January 9, 1990 agreement. The agreement expressly identifies BERNSTEIN as the broker in the transaction by stating that except for BERNSTEIN, no other broker has been employed or is entitled to compensation. The agreement also states that CAUFF, LIPPMAN is responsible for paying BERNSTEIN's compensation. New York courts have held that where a broker is expressly identified in a contract which references an obligation to pay a broker its commission, the broker is entitled to recover as a third party beneficiary. *Ambrose Mar–Elia Co. v. Dinstein*, 151 A.D.2d 416, 543 N.Y.S.2d 658 (1st Dep't 1989); *Edward S. Gordon Co. v. Blodnick, Shultz & Abramowitz, P.C.*, 150 A.D.2d 212, 540 N.Y.S.2d 816 (1st Dep't 1989); *Ficor, Inc. v. National Kinney Corp.*, 67 A.D.2d 659, 412 N.Y.S.2d 621 (1st Dep't 1979). In *Edward S. Gordon Co.*, the court stated:

That it [the broker] may recover as a third-party beneficiary is beyond dispute. Plaintiff was expressly identified by name in paragraph 11 of the sub-lease as one of "the brokers who brought about this [sub-lease] transaction" and to which "brokerage fees due to the broker shall be paid in accordance with the terms contained in a separate written agreement...."

*Id.* 543 N.Y.S.2d at 817.

5. At the time the January 9, 1990 contract was executed, all parties to the transaction knew of and consented to BERNSTEIN's role as a broker in the transaction. CAUFF, LIPPMAN evidenced its intention to benefit BERNSTEIN by agreeing to pay BERNSTEIN's fee out of the money it received from APOGEE's promised performance. Moreover, BERNSTEIN actively and directly participated in structuring and negotiating the transaction agreed upon in the January 9, 1990 contract, and APOGEE undoubtedly knew that BERNSTEIN would benefit financially from APOGEE's performance of the contract. The court finds that BERNSTEIN was an intended beneficiary of the January 9, 1990 agreement between APOGEE and CAUFF, LIPPMAN and has standing to sue in the capacity of a third-party beneficiary.

6. An enforceable contract must contain sufficiently explicit terms to enable a court to determine the intent of the parties to a reasonable degree of certainty, *Best Brands Beverage, Inc. v. Falstaff Brewing Corp.*, 842 F.2d 578, 587 (2d Cir. 1987), and it must be definite enough to be susceptible to judicial interpretation. *Brookhaven Housing Coalition v. Solomon*, 583 F.2d 584, 593 (2d Cir.1978). All material terms of the contract must be definite. *David v. Showtime/The Movie Channel, Inc.*, 697 F.Supp. 752, 761 (S.D.N.Y.1988). However, the fact that numerous non-material terms remain to be negotiated does not undermine the binding effect of an otherwise valid contract, *Roth v. Isomed, Inc.*, 746 F.Supp. 316, 319 (S.D.N.Y.1990); *Teachers Ins. & Annuity Asso. v. Tribune Co.*, 670 F.Supp. 491, 501 (S.D.N.Y.1987), nor does the fact that the contract requires subsequent documentation to formalize the agreement. *V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir.1968) *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969).

7. The January 9, 1990 contract between CAUFF, LIPPMAN and APOGEE sufficiently delineates the material terms governing the agreement, and is not, as defendants argue, merely an agreement to agree. The contract required CAUFF, LIPPMAN to purchase the Aircraft from

APOGEE at the price of $22,166,667.00 per Aircraft and resell them to APOGEE at a price of $22,500,000.00 per Aircraft. The agreement specified the dates of delivery of the Aircraft, the collateral documentation and its required terms, the payment terms, including dates of payment, amortization schedules and pre-payment provisions, the identity of the lender, insurance, tax and withholding provisions, and all other material terms of the transaction.

8. It was clearly the intention of CAUFF, LIPPMAN and APOGEE at the time they executed the January 9, 1990 agreement to enter into a binding and enforceable contract. The contract itself states that it "constitute[s] a binding agreement between [CAUFF, LIPPMAN] and [APOGEE] with respect to this transaction". Such language strongly suggests that the parties intended to form a binding contract obligating each party to negotiate in good faith to finalize all remaining terms in a manner consistent with the agreed upon terms. *Teachers Ins. & Annuity Asso.*, 670 F.Supp. at 499; *cf. Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir.1989) (regarding the language of the agreement as the most important factor to consider in deciding whether a preliminary agreement is binding). The inclusion in the contract of a condition precedent requiring KLM Supervisory Board approval for the transaction is not inconsistent with an intention to enter into a binding contract. *Teachers Ins. & Annuity Asso.*, 670 F.Supp. at 500.

9. The January 9, 1990 agreement was also supported by sufficient consideration by CAUFF, LIPPMAN. Among other things, CAUFF, LIPPMAN was required to and did secure a loan commitment from Credit Suisse, and APOGEE received a benefit from CAUFF, LIPPMAN's and BERNSTEIN's performance in the form of an acceptable loan commitment and a workable structure for the U.S. phase of the overall transaction.

■ 10. Defendants claim that CAUFF, LIPPMAN abandoned the January 9, 1990 contract at the January 16, 1990 meeting by agreeing to step out of the transaction set forth in the contract and proceed under a new transaction in which Credit Suisse would loan the funds directly to APOGEE, and CAUFF, LIPPMAN would receive a brokerage fee in an amount yet to be determined. A mutual agreement to abandon a contract discharges any obligations under the contract and renders the contract unenforceable. *Strychalski v. Mekus*, 54 A.D.2d 1068, 388 N.Y.S.2d 969, 970 (4th Dep't 1976).

■ 11. The question of whether a contract has been abandoned or cancelled by mutual agreement is generally a question of fact. *In re Estate of Rothko*, 43 N.Y.2d 305, 324, 401 N.Y.S.2d 449, 457, 372 N.E.2d 291 (1977); *Strychalski*, 388 N.Y.S.2d at 970. Abandonment may be inferred from the attendant circumstances and the conduct of the parties, but such conduct must be positive, unequivocal and inconsistent with an intent to be further bound by the contract. *Armour & Co. v. Celic*, 294 F.2d 432, 435–36 (2d Cir.1961); *Atlantic Co. v. Jarll Realty Corp.*, 36 A.D.2d 883, 320 N.Y.S.2d 769, 770 (3d Dep't 1971).

■ 12. When one party refuses to perform a contract and elects to abandon his or her rights under the contract, the other party may elect to sue for breach of contract or to treat the contract as abandoned. *Staebell v. Bennie*, 83 A.D.2d 765, 443 N.Y.S.2d 487, 488 (4th Dep't 1981). In order to constitute abandonment, there must be a repudiation of the contract and a refusal to perform it. *Id.* At no time did CAUFF, LIPPMAN refuse to perform its obligations under the January 9, 1990 contract. CAUFF, LIPPMAN's agreement to step out of the transaction if doing so would facilitate the transaction by accommodating APOGEE and Credit Suisse and if it would still receive the $1,999,998.00 agreed upon in the contract, does not constitute an abandonment of the January 9, 1990 contract. CAUFF, LIPPMAN at all times indicated that it was willing and able to proceed with the old transaction if the parties could not agree upon the new proposed structure for the transaction. (Findings of Fact, ¶¶ 44, 45, 51, 52, 54, 56). Because the parties were never able to agree on CAUFF, LIPPMAN's compensa-

tion under the new proposed structure, the original contract remained in effect. (Findings of Fact, ¶¶ 44, 45). Under these circumstances, no abandonment of the January 9, 1990 contract occurred.

13. At the heart of the dispute in this case is whether the conditions precedent in the January 9, 1990 contract were satisfied so as to render the contract enforceable against APOGEE. Where the performance of either party or the validity of the contract itself is conditioned upon the occurrence of some event, the contractual obligation does not arise if that event does not occur. *Office of the Comptroller General of the Republic of Bolivia on behalf of Bolivian Airforce v. International Promotions & Ventures, Ltd.*, 618 F.Supp. 202, 207 (S.D.N.Y.1985).

14. However, a party may not rely on another party's failure to perform a condition precedent to discharge that party's obligations under a contract where that party frustrated or prevented the occurrence of the condition. *Sunshine Steak, Salad & Seafood, Inc. v. W.I.M. Realty, Inc.*, 135 A.D.2d 891, 522 N.Y.S.2d 292, 293 (3d Dep't 1987); *Kooleraire Service & Installation Corp. v. Board of Educ.*, 28 N.Y.2d 101, 320 N.Y.S.2d 46, 268 N.E.2d 782 (1971). The doctrine of prevention "excuses a condition precedent when a party wrongfully prevents that condition from occurring." *In re Gulf Oil*, 725 F.Supp. at 737 n. 9. The prevention doctrine rests on the precept that " 'no person can rely on the occurrence or non-occurrence of a condition when he wrongfully prevented or caused it....' " *In re Gulf Oil*, 725 F.Supp. at 737 n. 9 (quoting 3A *Corbin on Contracts* § 654 D at 931–32 (Kauffman Supp.1989)); *see also Arc Electrical Constr. Co., Inc. v. George A. Fuller Co.*, 24 N.Y.2d 99, 104, 299 N.Y.S.2d 129, 132, 247 N.E.2d 111 (1969) ("[D]efendant cannot rely on [a] condition precedent ... where the *non-performance of the condition was caused or consented to by itself*.").

15. APOGEE had an obligation to act in good faith and to act in a manner consistent with the fulfillment of the conditions precedent set forth in the January 9, 1990 contract. The prevention doctrine is substantially related to the implied covenant of good faith and fair dealing implicit in every contract. *In re Gulf Oil*, 725 F.Supp. at 735–38; *Bass v. Sevits*, 78 A.D.2d 926, 433 N.Y.S.2d 245 (3d Dep't 1980). The implied covenant of good faith and fair dealing requires a promisor to reasonably facilitate the occurrence of a condition precedent by either refraining from conduct which would prevent or hinder the occurrence of the condition, or by taking positive action to cause its occurrence. *In re Roman Crest Fruit, Inc.*, 35 B.R. 939 (Bankr.S.D.N.Y.1983). A party's failure to act in good faith so as to facilitate the occurrence of a condition precedent requires the condition to be deemed satisfied or excused, rendering the contract enforceable. *Id.*

16. Applying the implied obligation of good faith and fair dealing and the prevention doctrine to this case, the court finds that all four of the conditions precedent in the January 9, 1990 contract were either satisfied or prevented from occurring by APOGEE's bad faith.

17. The first condition precedent, which required the parties to negotiate and execute the customary documents for such transactions, is excused because APOGEE wrongfully prevented its occurrence. The January 9, 1990 contract obligated APOGEE to act in good faith to attempt to conclude a final agreement within the terms specified in the contract. *Teachers Ins. & Annuity Asso.*, 670 F.Supp. at 500–501.

18. However, APOGEE refused to pursue further negotiations to finalize the necessary documents not because it could not in good faith agree upon the terms left open in the agreement, but because it objected to CAUFF, LIPPMAN's compensation which had been specifically agreed to in the January 9, 1990 contract. (Findings of Fact, ¶¶ 51, 53, 59, 63). All of the documents necessary to finalize the transaction had been prepared or substantially prepared by January 16, 1990. (Findings of Fact, ¶¶ 48, 49). The parties agreed to certain changes in the documents at the January 16, 1990 meeting, and APOGEE

instructed its counsel to prepare the revised documents incorporating those changes. (Findings of Fact, ¶¶ 46, 48). However, APOGEE cancelled the previously scheduled January 18, 1990 meeting at which the final documents were to be executed. (Findings of Fact, ¶ 49). At a rescheduled meeting, APOGEE refused to proceed with the transaction unless CAUFF, LIPPMAN lowered its contractually agreed upon fee. (Findings of Fact, ¶ 51).

19. The second condition precedent required that the Aircraft be sold and delivered according to the dates set forth in the January 9, 1990 agreement. This condition was similarly prevented by APOGEE. Had APOGEE appeared for the January 18, 1990 meeting and acted in good faith, the necessary closing documents would have been executed at that meeting, or shortly thereafter, and delivery of the Aircraft would have occurred as provided for in the agreement. (Findings of Fact, ¶ 60). Moreover, this condition was satisfied in the U.S. phase of the overall transaction when APOGEE proceeded with financing from Yasuda. (*Id.*).

20. The third condition precedent, which required CAUFF, LIPPMAN to secure a loan commitment on terms acceptable to APOGEE, was satisfied. Although APOGEE denies that the loan commitment procured from Credit Suisse was acceptable, the overwhelming evidence is to the contrary. At the conclusion of the January 16, 1990 meeting, GOULD instructed APOGEE's attorneys to prepare revised documentation consistent with the negotiations that had occurred, and scheduled a meeting for January 18, 1990 to finalize and execute the revised documents. (Findings of Fact, ¶¶ 46, 48). APOGEE voiced no major objections to the Credit Suisse financing at the conclusion of the January 16, 1990 meeting. (Findings of Fact, ¶¶ 46, 47). In fact, APOGEE's explanation for why the transaction embodied in the January 9, 1990 agreement was not completed was that, in GOULD's view, CAUFF, LIPPMAN's fee was excessive. (Findings of Fact, ¶ 51). The fact that APOGEE sought to enter into a direct financing relationship with Credit Suisse after the termination of negotiations between APOGEE and CAUFF, LIPPMAN further supports the conclusion that this condition precedent was satisfied. (Findings of Fact, ¶ 63). Moreover, the terms of the financing APOGEE eventually secured from an alternative source are the same or substantially similar to the terms previously offered by Credit Suisse. (Findings of Fact, ¶ 66).

21. To the extent that the terms of the Credit Suisse loan commitment were not acceptable to APOGEE, the absence of such a loan commitment is attributable to APOGEE's own bad faith. Had negotiations broken down in good faith over terms not dictated by the January 9, 1990 contract, the non-existence of this condition precedent would absolve APOGEE of its obligations under the contract. In fact, however, negotiations on the Credit Suisse loan commitment broke down because CAUFF, LIPPMAN did not agree to accept compensation lower than that agreed upon in the contract. (Findings of Fact, ¶¶ 49–55). Had CAUFF, LIPPMAN accepted GOULD's demands to lower its fee, APOGEE would have continued to negotiate the Credit Suisse financing. (Findings of Fact, ¶¶ 51, 63). Under such circumstances, the failure of the parties to satisfy this condition precedent is chargeable to APOGEE. *Teachers Ins. & Annuity Asso. v. Tribune Co.*, 670 F.Supp. at 506.

22. Moreover, APOGEE prevented the procurement of an acceptable loan commitment from Credit Suisse when it cancelled the January 18, 1990 meeting and refused to engage in further negotiations to complete the transaction as contemplated by the January 9, 1990 agreement. (Findings of Fact, ¶¶ 49–55). Even if additional terms remained to be agreed upon in the Credit Suisse loan commitment, and even though the deal could have fallen through due to genuine disagreement over those terms, APOGEE cannot avoid its obligations under the contract when its refusal to participate in further negotiations prevented any possibility of finalizing the agreement. *Collins Tuttle & Co., Inc. v. Ausnit*, 95 A.D.2d 668, 463 N.Y.S.2d 219, 221 (1st Dep't 1983).

23. The fourth condition precedent required approval of the contract by KLM's Supervisory Board. This condition is excused by APOGEE's failure to seek this approval in good faith. APOGEE could not escape its obligations under the contract merely by failing to take the steps necessary to obtain KLM Supervisory Board approval, nor could it avoid its contractual duty to negotiate in good faith to finalize the closing documents simply because KLM's Supervisory Board had not yet approved the transaction. *Teachers Ins. & Annuity Asso.*, 670 F.Supp. at 503. After executing the January 9, 1990 agreement, APOGEE had a good faith duty to attempt to obtain KLM's approval of the contract. However, APOGEE did not make a good faith effort to obtain KLM Supervisory Board approval. (Findings of Fact, ¶¶ 70–74). Where the occurrence of events leading to the performance of a condition precedent is under the control of the defendant, the defendant cannot rely on the non-occurrence of the condition to defeat its contractual obligations. *Shuster v. First Nat. Monetary Corp.*, 450 N.Y.S.2d 711, 715, 113 Misc.2d 1058 (N.Y. City Civ.Ct.1982).

24. APOGEE's failure to seek KLM approval is not justified by the fact that KLM regarded CAUFF, LIPPMAN's compensation under the January 9, 1990 agreement as excessive. APOGEE knew for some time that KLM objected to CAUFF, LIPPMAN's fee, and yet executed the January 9, 1990 contract and failed to disclose KLM's objections to CAUFF, LIPPMAN, BERNSTEIN or Credit Suisse. (Findings of Fact, ¶ 73). Moreover, KLM would have approved the January 9, 1990 transaction, including CAUFF, LIPPMAN's compensation under the contract, if the transaction had closed. The transaction never closed, however, because APOGEE refused to proceed with negotiations unless CAUFF, LIPPMAN agreed to lower its compensation under the contract. The condition precedent requiring KLM Supervisory Board approval for the transaction did not permit APOGEE to walk away from the deal with CAUFF, LIPPMAN merely because an opportunity arose to complete a preferable transaction with Yasuda. *Teachers Ins. & Annuity Asso.*, 670 F.Supp. at 500.

25. Under New York law, a party injured by a breach of contract must be placed in the same economic position as it would have been in had the contract been performed. *Teachers Ins. & Annuity Asso. of America v. Butler*, 626 F.Supp. 1229, 1236 (S.D.N.Y.1986). CAUFF, LIPPMAN is thus entitled to damages equal to the profit it would have realized from the January 9, 1990 contract in the amount of $1,999,998.00, together with prejudgment interest from January 18, 1990, the date this court finds that APOGEE breached its contract with CAUFF, LIPPMAN. These damages also enure to the benefit of BERNSTEIN to the extent of the amount due BERNSTEIN under his commission agreement with CAUFF, LIPPMAN.

26. Plaintiffs have also established a right to recover $1,400,000.00 in damages under their alternative theory of quantum meruit. A party who has conferred a benefit on another under circumstances giving rise to unjust enrichment may assert a claim of quantum meruit against the recipient of the benefit. *S.S. Silberblatt, Inc. v. East Harlem Pilot Block–Building 1 Housing Dev. Fund Co.*, 608 F.2d 28 (2d Cir.1979); *Hutton v. Klabal*, 726 F.Supp. 67 (S.D.N.Y.1989). After BERNSTEIN, CAUFF, LIPPMAN and Credit Suisse laid the groundwork for the U.S. phase of the overall transaction, GOULD reaped the benefit of their work and was immediately able to secure a substantially identical financing commitment from Yasuda, which KLM approved. However, because plaintiffs have prevailed on their breach of contract claim and are not entitled to double recovery, plaintiffs' recovery is limited to damages on their breach of contract claim.

Plaintiffs are entitled to judgment in the amount of $1,999,998.00 plus pre-judgment interest dating from January 18, 1990, plus costs and disbursements.