■ AMBROSE MAR-ELIA CO., INC., Appellant-Respondent, v STANFORD DINSTEIN et al., Respondents-Appellants.—Order of the Supreme Court, New York County (David H. Edwards, Jr., J.), entered January 26, 1989, which denied plaintiff's motion

and defendants' cross motion for summary judgment, is unanimously modified, on the law, to the extent of granting plaintiff's motion for summary judgment against defendants in the amount of $75,000 and dismissing defendants' affirmative defenses and counterclaims, and otherwise affirmed, with costs and disbursements payable to plaintiff.

After Judith Medwin, a licensed salesperson employed by plaintiff, brought the movie star, Cher, to look at defendants' condominium apartment, Mr. Dinstein told Ms. Medwin that he would pay her a 6% commission if Cher purchased the apartment for $1,500,000, all cash, and a 3% commission if Cher purchased the apartment for a lesser agreed-upon amount, all cash.

Offers and counteroffers were made in 1986 through Medwin, and Dinstein agreed to sell for $1,250,000 and told Medwin the transaction had to close before the end of 1986 because of impending tax law changes. However, Cher was unable to commit to an all-cash payment prior to December 31, 1986, and the deal was restructured.

The contract of sale for the apartment was signed on December 31, 1986 by the Dinsteins' attorney-in-fact, Margaret Bergin, pursuant to a power of attorney from each of the Dinsteins.

Before this contract was signed, but after the parties had agreed to the price and portions of the contract had been prepared, the Dinsteins' attorney, Jack Weprin, had an associate prepare a brokerage agreement which was signed by plaintiff Ambrose. This agreement provided that Ambrose "AGREES to accept the sum of $75,000.00 in full and final payment and satisfaction of all claims and charges for commissions or compensation in effecting such Sale". It also limited Ambrose's right to recovery by providing that Ambrose's entitlement to a commission was conditioned upon actual closing of title. Further, Ambrose agreed to indemnify the Dinsteins from a claim by any other broker for a commission. The brokerage agreement contained a line in the lower left portion for the Dinsteins' signature, but defendants never signed this agreement.

The closing took place on December 31, 1986, the same day the contract was signed. Payment was made by $100,000 cash, assumption of a mortgage of approximately $400,000 and delivery of a purchase-money mortgage of approximately $750,000. Although the purchase-money mortgage was paid in March 1987, defendants refused to pay Ambrose a commission and this action ensued.

The IAS court denied both plaintiff's motion and defendants' cross motion for summary judgment. However, the court committed error in denying plaintiff's motion for summary judgment.

The contract of sale signed by defendants' attorney-in-fact, in paragraph 7.1, provided: "Buyer's representation. The Buyer represents that the Buyer dealt with no broker in connection with the sale other than Ambrose Mar-Elia and *sellers* agree to pay the commission in accordance with separate agreement." (Emphasis added.)

Paragraph 12 of the contract of sale provides as follows: "Supplementing Paragraph 7 herein, purchaser agrees to indemnify and hold seller harmless from and against any and all claims, losses, liabilities, costs and expenses (including, without limitation, reasonable counsel fees and disbursements) resulting from any claim that may be made against seller by any broker or other person *other than Ambrose Mar-Elia,* claiming a commission, fee or other compensation by reason of this transaction, if the same shall arise by, through or on account of any act of purchaser or purchaser's representative. The obligation of the purchaser under this Paragraph shall survive the closing or cancellation of this agreement." (Emphasis added.)

These provisions clearly acknowledge that the defendants were obligated to pay Ambrose a commission *(see, May Co. v Monaco Assocs.,* 80 AD2d 798). In that case, where a clause in the contract of sale was basically the same as paragraph 7.1 *supra,* we held that summary judgment should have been granted because the paragraph "represents an admission by defendants that plaintiffs rendered some services with respect to the transaction and are entitled to the reasonable value thereof. (See *Ficor, Inc. v National Kinney Corp.,* 67 AD2d 659.)" *(Supra,* at 799.)

In both *Ficor (supra)* and *May Co. (supra),* we permitted summary judgment as to liability solely upon the contracts of sale to which the broker was not a party, but rather a third-party creditor beneficiary *(see, Lawrence v Fox,* 20 NY 268).

Further, the brokerage agreement which set the commission at $75,000, signed by plaintiff and prepared by defendants' attorneys, was enforceable against defendants even though unsigned by them. "Signed and unsigned writings relating to the same transaction and containing all the essential terms of a contract may be read together to evidence a binding contract" *(Weiner & Co. v Teitelbaum,* 107 AD2d 583). In addition,

as noted, the attorney-in-fact and the attorney selected by defendants to represent them at the contract closing had the authority to bind the defendants to the brokerage agreement. In an affidavit submitted to the IAS court, defendant Stanford Dinstein admitted he and his wife were away at the time of the closing and had "left the matter in the hands of our attorneys". Since defendants admitted that Ms. Bergin had a power of attorney specifically to sign the contract of sale, she acted with actual and apparent authority to bind defendants to the contract of sale (see, Zaubler v Picone, 100 AD2d 620, 621).

The absence of a signature by defendants or that of someone signing on their behalf on the brokerage agreement also does not bar the effectiveness of that agreement. Defendants' attorneys insisted upon the agreement to preclude plaintiff from making a claim if there was no closing. It was only after the defendants had derived the benefit of the agreement (by having the assurance of no claim by the broker if the transaction did not close) that they sought to repudiate it. "A party by receiving and retaining without objection under certain circumstances a written contract signed by the other party may be held bound by the terms of such writing, though he himself has not signed" (Matter of Exeter Mfg. Co. [Marrus], 254 App Div 496, 498).

While defendants raise an oral agreement that the plaintiff would receive a commission only if the transaction were "all cash", any such parol evidence would be barred as varying the terms of the written agreements herein. This parol evidence rule applies even to the contract of sale where plaintiff was not a party, but a third-party beneficiary (see, Oxford Commercial Corp. v Landau, 12 NY2d 362, 365).

The five affirmative defenses and three counterclaims also should have been dismissed by the IAS court.

The first affirmative defense related to personal jurisdiction and was withdrawn after plaintiff moved for its dismissal.

In the second affirmative defense, the defendants claim that plaintiff breached its duty to use its utmost efforts to obtain the highest price by, among other things: causing an appraisal report that the value of the apartment was only $1,100,000; taking advantage of the fact that defendants wanted to close by December 31, 1986; representing that an agreement had been reached when Cher was unable to pay the purchase price by December 31st; and failing to disclose its representation of Cher.

Since the defendants closed with Cher, they are estopped from now asserting that they are not obligated to pay the commission (see, 11 NY Jur 2d, Brokers, § 115, formerly 6 NY Jur, Brokers, § 111). In addition, unrebutted evidence was submitted that the appraisal was performed at the request of Cher, not the plaintiff, and that defendants consented to it. Further, defendants made no showing whatsoever that the appraisal was not accurate.

The claim that plaintiff took advantage of the defendants' desire to close by December 31, 1986 is belied by the fact that defendants chose to close, knowing of the purchase-money mortgage, thereby ratifying the transaction. The record also discloses that Mr. Dinstein was aware that plaintiff represented Cher. Further, plaintiff was not obligated to use "utmost efforts" to obtain the highest price, but solely had an obligation to find a ready, willing and able purchaser, which it did.

The third affirmative defense and first counterclaim simply repeats the allegations of the second affirmative defense and is likewise deficient.

The fourth affirmative defense and second counterclaim alleges that plaintiff misrepresented that it would use its best efforts to find a buyer for $1,500,000, all cash, and that defendants relied upon this misrepresentation. Once more, defendants ratified the transaction by closing with Cher. In addition, any such statements would be promissory in nature and could not give rise to a claim for fraud (Lanzi v Brooks, 54 AD2d 1057, affd 43 NY2d 778).

In the fifth affirmative defense and third counterclaim, it is alleged that plaintiff represented that it would find the defendants an apartment satisfactory to them to which they could move after their apartment was sold and that, since plaintiff failed to do so, they were forced to pay $11,160 to another broker. However, the terms of the contract of sale, and the brokerage agreement, make no reference to this and, therefore, the parol evidence rule bars these alleged additional terms. Concur—Sullivan, J. P., Asch, Milonas, Wallach and Rubin, JJ.