Vivian June **BARNUM**, Plaintiff,

v.

**MILLBROOK CARE LIMITED PART-NERSHIP, Reis Capital Management, Inc., David Reis, individually and in his capacity as President of Reis Capital Management, Inc.,** Defendants.

No. 93 Civ. 4670 (RWS).

United States District Court, S.D. New York.

May 12, 1994.

Holtzman & Taikeff, New York City, for plaintiff (Stuart Holtzman and Edwin Oppenheimer, of counsel).

Hofheimer Gartlir & Gross, New York City, for defendants (Douglas Gross, of counsel).

*OPINION*

SWEET, District Judge.

Defendants Millbrook Care Limited Partnership ("Millbrook"), Reis Capital Management, Inc. ("Reis Inc."), and David Reis ("Reis"), individually and as President of Reis Inc., (collectively, the "Defendants"), move to dismiss the Complaint of Plaintiff Vivian June Barnum (the "Plaintiff" or "Barnum"), pursuant to Rule 12(b)(6) or Rule 9(b), Fed.R.Civ.Pro. or, in the alternative, for an order granting summary judgment, pursuant to Rule 56, Fed.R.Civ.Pro., on Plaintiff's second claim for relief. Barnum opposes the Defendants' motion to dismiss and cross moves for an order of Summary Judgment in her favor, pursuant to Rule 56, Fed. R.Civ.Pro.

For the reasons set forth below, the Defendants' motion to dismiss the Complaint with prejudice is granted.

### The Parties

Barnum, a domiciliary of the state of Texas, is the holder of a promissory note (the "Promissory Note" or "Note") in the amount of $78,810 executed in her favor by the Defendants on December 21, 1990.

Millbrook is a Connecticut limited partnership and the owner of a retirement center formerly known as Greercrest Retirement Center ("Greercrest"), now known as Millbrook Meadows.

Reis Inc., a corporation formed under the laws of the State of Connecticut, is a general partner of Millbrook.

David Reis is the President of Capital Management.

### Prior Proceedings and Facts

Barnum, at the time of filing her complaint in 1993, is an 80 year old woman who had

been a resident in Greercrest Retirement Community ("Greercrest"), a managed care retirement community located in Millbrook, New York. Barnum had paid a $78,810 entrance fee to the sponsor and operator of Greercrest, Greer–Woodycrest Children's Services, Inc. ("Greer–Woodycrest Inc.") pursuant to the terms of a Life Occupancy Agreement (the "Offering Plan").

Barnum ceased living in Greercrest at some point in the fall of 1990, but no later than November 29, 1990. (Am.Compl.Ex.D.) Although a section of the Offering Plan stated it would reimburse the entrance fee if residency in Greercrest was terminated, (Am.Compl.Ex.A.), Greer–Woodycrest did not refund Barnum's entrance fee upon her termination of residency.[1]

In 1990, Greer–Woodcrest became insolvent. On October 5, 1990, a Purchase and Sale Agreement (the "Agreement") was entered into between Reis Inc. and Greer–Woodycrest Inc.[2] On November 30, 1990, Reis Inc. assigned its rights under the Agreement to Millbrook Care.

The Agreement provided that Reis Inc. would agree to assume Greer–Woodycrest's obligation to repay entrance fees pursuant to the following conditions set forth in Section 8.15:

> All persons who are entitled to receive repayment from Purchaser of entrance fees previously paid to Seller on account of Purchaser's assumption of the Assumed Liabilities shall have entered into agreements satisfactory in form and substance to Purchaser regarding such repayments. Such agreements shall provide, *inter alia*, that: (i) such repayments are to be made from funds paid to Purchaser as the loan portion of entrance fees paid under New Residency Agreements entered into after the Closing Date with respect to units of

the Retirement Community which were subject to no Residency Agreements or to Residency Agreements with Terminating Residents, as of the Closing Date (the "Repayment Funds"); (ii) the Repayment Funds shall be paid promptly after receipt by Purchaser to the persons entitled thereto in the chronological order of the dates on which of such persons are entitled to receive repayment of their entrance fees under their Residency Agreements with Seller; (iii) such repayments shall all be made no later than two years after the Closing Date, whether or not the Repayment Funds are then sufficient; (iv) such repayments shall bear interest at the rate of nine percent per annum, payable quarterly, commencing with the Closing Date; and (v) Purchaser's obligation to make such payments shall be secured by a lien on the RC [Retirement Community] Parcel.

(Agreement § 8.15.) Reis Inc. further indemnified Greer–Woodycrest from liabilities arising from a breach of Reis Inc.'s representations, warranties, covenants or undertakings pursuant to the Agreement, (Agreement § 12.1.), under an abbreviated liabilities limitation period of 15 months after the sale closing date.

On November 21, 1990, the terms of the Agreement were set forth to the residents in the Second Amendment which stated in the first paragraph that, "THE SALE IS CONDITIONAL ON ... ALL PERSONS WHO ARE ENTITLED TO RECEIVE REPAYMENT OF ENTRANCE FEES PREVIOUSLY PAID HAVING ENTERED INTO AGREEMENTS SATISFACTORY TO MILLBROOK CARE REGARDING SUCH REPAYMENT OF ENTRANCE FEES OWED TO THEM." (Gross Reply Decl.Ex. 1.)

---

1. On November 21, 1990, a Second Amendment to the Offering Plan ("Second Amendment") stated that Greer–Woodycrest was in default of its obligations to repay entrance fees to former residents and that a $1,000,000 escrow account which was to have been set aside for such refunds did not exist. (Gross Reply Decl.Ex. 1.)

2. The Agreement was partially incorporated in Barnum's Amended Complaint. (Am.Compl.Ex B.) However, the entire Agreement has been

submitted by the Defendants, (Defs.' Mot. to Dismiss Ex. 1), and may be duly considered by the Court upon a motion to dismiss. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *Ahmed v. Trupin*, 809 F.Supp. 1100, 1105 (S.D.N.Y.1993).

Attached as Exhibits G and H of the Second Amendment are the Form of Consent for Terminated Residents ("Consent Form"), which was to be executed by terminated residents in exchange for Exhibit H, the "Promissory Note." On November 29, 1990, Barnum executed the Consent Form which stated she agreed to the contents of the Second Amendment and the attached Note.[3]

On December 21, 1990, Millbrook took title to Greercrest from Greer–Woodycrest pursuant to the Agreement. Barnum received the Note, dated December 21, 1990, from Millbrook in the amount of $78,810. (Am. Compl.Ex.E.) The Note does not differ from the model Promissory Note attached as Exhibit H of the Second Amendment and to which Barnum agreed to in the Consent Form.

Section Nine of the Note, entitled "Non–Recourse," stated that it "expressly limited [ ] the Resident's [Barnum's] rights and recourse to the reversionary interest in the Real Estate, it being expressly understood, that the Resident shall have no rights against, and shall seek no judgment against the undersigned or any other assets of the undersigned." (Gross Decl.Ex. 1, Note § 9.)

Millbrook was to pay principal upon the Note from 90% of the funds received from new residents of Greercrest with respect to units that were being vacated or had been vacated by the terminated residents as of the closing date. The original maturity date of the Note was December 21, 1992.

The following year, in November 1991, Millbrook's president, Reis, sent a letter to the terminated residents asking them to agree to a modification of the Notes. The modification sought by Millbrook sought to use a portion of the Vacant Pooled Funds to subsidize the Millbrook's operating deficit. In the letter, Reis stated that he had submitted the proposed modification to Robert Levine ("Levine"), the lawyer for Millbrook Meadows Residents Association, and that Levine did not object to the "form" of the amendment.[4] Barnum agreed to the modification of her Note in late November or early December of 1991.

In her cover letter, returned with the signed modifications, Barnum inquired as to how many terminated residents were before her on the list of former residents waiting for repayment. Barnum contends that instead of answering the question she asked, in a letter of December 12, 1991, the Defendants wrote the following:

> In your letter to David Reis you requested to know where you stand on the list of terminated residents waiting for payment. Let me bring you up to date on our efforts. We have already paid $300,950 to terminated residents who are on the Pool A list. Before we come to your name on the list, there is an additional $674,150 to be paid. It is difficult to project how quickly you can expect to receive your refund.

(Am.Compl. ¶ 39.)

Barnum alleges that the November 30, 1992 Amendment to the Restated Offering Plan, filed a year later with the Attorney General of New York painted "an entirely different and decidedly bleaker financial picture" than that which had been portrayed to

---

**3.** The Form Consent for Terminated Residents which Barnum signed stated in relevant part: "I have read and reviewed the Second Amendment to the Offering Plan [for the Community] together with the Exhibits to the Amendment. In particular, I have reviewed Paragraph 5 of the Amendment which addresses my rights as a Terminated Resident to receive repayment of my entrance fee previously paid.... I further understand that I may be paid by partial payment until the entire entrance fee plus interest has been fully paid ... except to the extent that any of such fees (up to a maximum of $300,000.00) are required to be paid to the Sponsor as relating to a "Sponsored Referred Sale" more fully described in the promissory note annexed to the Second Amendment as Exhibit H."

**4.** There is a dispute between the parties as to whether Levine represented Barnum. According to the Defendants, Levine, as the lawyer to the Millbrook Residents Association, represented terminated as well as current residents. According to Barnum, the statement by Reis that he had submitted the modification to "your attorney was false," because Levine represents current, not former residents, and furthermore was written with the intent to "fraudulently lull" Barnum into believing that an attorney with "undivided loyalty to her interests had reviewed the proposed amended note and had approved [the] same for her to sign." (Am.Compl. ¶ 37.)

**1232**

her in Reis' November 1991 letter.[5] (Am. Compl. ¶ 41.)

On May 12, and June 1, 1993, Reis informed Barnum that Millbrook could only repay 40% of the amount due to her under the Note. (Am.Compl. ¶ 42.)

On July 12, 1993, Barnum filed her Amended Complaint in this action which alleges the following three claims: (1) breach of contract to her as a third-party beneficiary to the Agreement; (2) common law fraud by means of a scheme to induce her to modify the terms of the Note, for which she is entitled $2,000,000 in punitive damages; and (3) and emotional distress and mental suffering, for which she is entitled $1,000,000.

Initially, Barnum had filed a Complaint alleging that Defendants had violated the Securities Act of 1933. At a conference before this Court, counsel to the Defendants stated that Plaintiff had not stated a claim for which relief could be granted. On October 5, 1993, at the suggestion of the Court, Defendants' counsel provided Plaintiff's counsel with a draft memorandum of law in support of a motion to dismiss which the Defendants intended to file unless Plaintiff withdrew or amended her Complaint.

Barnum subsequently amended her Complaint on November 24, 1993. Defendants filed their motion to dismiss the Amended Complaint on December 28, 1993 and Barnum cross-moved for Summary Judgment on March 14, 1994. Oral argument on the motions was heard on April 6, 1994. The motions were considered fully submitted as of that date.

*Discussion*

■ On a Rule 12(b)(6) motion to dismiss, the factual allegations of the complaint are presumed to be true and all factual inferences must be drawn in their favor and against

the defendants. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989); *Dwyer v. Regan,* 777 F.2d 825, 828–29 (2d Cir.1985). Accordingly, the factual allegations considered here are taken from the Plaintiffs' Amended Complaint and do not constitute findings of fact by the Court. They are presumed to be true only for the purpose of deciding the present motions.

■ Rule 12(b)(6) also imposes a substantial burden of proof upon the moving party. A court may not dismiss a complaint unless the movant demonstrates "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *accord Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984) (quoted in *H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 250, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 (1989)).

■ In the event that a plaintiff alleges a claim based on a written instrument, as is the case here, the court may consider such an instrument in ruling on a Rule 12(b)(6) motion even if it was not attached to the complaint and made a part thereof under Rule 10(c), Fed.R.Civ.P. *See Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991) ("*Cortec*") (considering publicly filed disclosure documents), *cert. denied,* —— U.S. ——, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir.1991) ("*I. Meyer Pincus*") (considering a prospectus).

■ Additionally, if the allegations of a complaint are contradicted by documents made a part thereof, the document controls

5. There is some confusion as to whether the Defendants sought the following additional modifications of the Notes on November 30, 1992: (1) changing the interest rate to prime from 9% per annum; (2) extending the maturity date to December 31, 1993; and (3) seeking to use a portion of the Vacant Pooled Funds to subsidize the Millbrook's operating deficit. (*Compare* Defs. Mem. of Law at 7 (citing Am.Compl. ¶ 41 for the proposition that second letter was sent out on November 30, 1992) *with* Am.Compl. ¶ 41 (which does not mention second request for modification and complains that *the* letter of first December 12, 1991, and then December 12, 1992—not 1991—is inconsistent with Amendment filed with Attorney General in two weeks earlier in 1992)). This confusion of fact is not clarified in the parties Rule 3(g) statements. However, all parties appear to agree that the allegedly fraudulent letters at issue were sent in November and December, 1991.

and the court need not accept as true the allegations of the complaint. *See Feick v. Fleener,* 653 F.2d 69, 75 & n. 4 (2d Cir.1981); *United States ex rel. Sommer v. Dixon,* 524 F.Supp. 83, 85 (N.D.N.Y.1981), *aff'd per curiam,* 709 F.2d 173 (2d Cir.), *cert. denied,* 464 U.S. 857, 104 S.Ct. 177, 78 L.Ed.2d 158 (1983). Following the logic of *Cortec* and *I. Meyer Pincus,* this rule also applies to the instruments supplied by the Defendant in support of their Rule 12(b)(6) motion to dismiss.

## I. Barnum's Breach of Contract Claim

### A. *Barnum is a Third–Party Beneficiary to the Agreement*

The Restatement (Second) of Contracts provides that a third party is an intended beneficiary to a contract if:

recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

Restatement (Second) of Contracts § 302 (1981). "New York law follows the Restatement (Second) of Contracts § 302 (1979) in allowing a third party to enforce a contract if that third party is an intended beneficiary of the contract." *Flickinger v. Harold C. Brown & Co.,* 947 F.2d 595, 600 (2d Cir.1991) (citing *Septembertide Publishing, B.V. v. Stein & Day, Inc.,* 884 F.2d 675, 679 (2d Cir.1989); *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.,* 66 N.Y.2d 38, 44, 495 N.Y.S.2d 1, 485 N.E.2d 208 (1985)); *see also Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 573 (2d Cir.1991) (same).

■ The courts may look at the surrounding circumstances as well as the agreement when determining whether a third-party beneficiary exists. *Septembertide Publishing, B.V. v. Stein & Day, Inc.,* 884 F.2d 675, 679 (2d Cir.1989); *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.,* 66 N.Y.2d at 45, 495 N.Y.S.2d 1, 485 N.E.2d 208.

It is also "well-settled that the obligation to perform to the third-party beneficiary need not be expressly stated in the contract." *Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 573 (2d Cir. 1991); *see also Cauff, Lippman & Co. v. Apogee Fin. Group, Inc.,* 807 F.Supp. 1007, 1020 (S.D.N.Y.1992) (stating that "[a]lthough the parties' intention to benefit the third-party must be gleaned from the face of the contract, *In re Gulf Oil/Cities Service Tender Offer Litigation,* 725 F.Supp. 712, 733 (S.D.N.Y.1989), the defendant's obligation to the third-party beneficiary need not be explicitly stated in the contract itself. *Vista Co. v. Columbia Pictures, Inc.,* 725 F.Supp. 1286, 1296 (S.D.N.Y.1989).").

■ Section 2.1 of the Agreement, entitled "Liabilities and Contingent Payments," provides that:

it is expressly understood and agreed that the consideration for the sale of the RC [Retirement Community] Parcel and the RC Assets is the assumption by Purchaser of the Seller's obligation to repay up to $2,114,200 to residents of the Retirement Community who have either (a) terminated their Residency Agreements (the "Terminated Residents"), or (b) notified Seller of their intent to terminate their Residency Agreements (the "Terminating Residents"), and who are or will be entitled to a return of the entrance fee paid under their Residency Agreements (the "Assumed Liabilities").

Barnum was identified by name in the attached *Schedule 2.1* as a resident to whom the return of her entrance fee was owed.

The requisite donative intent necessary to establish Barnum's status as a third-party beneficiary is created by the provision to return the entrance fee to Barnum at the time of the Agreement's consummation. *Cf. Citicorp Int'l Trading Co. v. Western Oil & Ref. Co.,* 771 F.Supp. 600, 604 (S.D.N.Y.1991) (finding no donative intent since the alleged third-party beneficiaries do not assert that the Bank owed them anything prior to singing of the agreement, nor have the alleged facts which indicated donative intent).

Defendants make no claim that Barnum was not a person entitled to receive her entrance fee pursuant to this section of the Agreement, rather they assert that she was not an "intended" beneficiary but only an "incidental beneficiary" to the Agreement, and as an incidental beneficiary, Barnum has no rights to enforce a contract to which she was not a party. *See Oursler v. Women's Interart Ctr., Inc.*, 170 A.D.2d 407, 566 N.Y.S.2d 295 (1st Dept.1991). The New York Court of Appeals has stated that a third-party beneficiary must establish that he or she has a "right to enforce the contract" or "the language of the contract otherwise clearly evidences an intent to permit enforcement by the third party." *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38, 45, 495 N.Y.S.2d 1, 485 N.E.2d 208 (1985). *But see Strauss v. Belle Realty Co.*, 98 A.D.2d 424, 426–27, 469 N.Y.S.2d 948 (2d Dept.1983) (to enforce promise third party need not be identified in contract but need only show intent of contracting parties to benefit third party).

Defendants' contention that under the plain terms of the Agreement neither party to the Agreement intended to benefit the terminated residents and had no expectation that a terminated resident could sue to carry out the terms of the Agreement disregards the language of the Amendment to the Agreement which clearly states that:

> Entrance fees to Terminated Residents shall be repaid by means of full or partial payments until the entire principal plus interest is fully paid.... Return of these entrance fees will be *secured* by the right of reacquisition by the Millbrook Meadows Residents Association, Inc. of the Greercrest Property contained in the deed from the Association to Millbrook Care.

(Amendment § 5, emphasis added.) Since Barnum is a member of the Millbrook Meadows Residents Association, with a secured right of reacquisition in case of default, she must be considered an intended third-party beneficiary with enforceable rights under the Agreement.

■ Moreover, it is not the intention of the promisor which governs this determination. Rather, it is the expressed intent of the promisee which determines whether the beneficiary is entitled to the benefits of the Agreement. *Drake v. Drake*, 89 A.D.2d 207, 455 N.Y.S.2d 420, 422 (4th Dept.1982) (holding "the intention of the promisee is of primary importance, since the promisee procured the promise by furnishing consideration therefor.") (citation omitted); *Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 573 (2d Cir.1991) ("An intended third party beneficiary will be found when it is appropriate to recognize a right to performance in the third party and the circumstances indicate that the promisee intends to give the third party the benefit of the promised performance.") (citations omitted).

In this case, Reis Inc.'s promise to repay Barnum was not only "appropriate to effect the intention of the parties," *Fourth Ocean*, 66 N.Y.2d at 44 n. 2, 495 N.Y.S.2d 1, 485 N.E.2d 208, it was the consideration given by Reis Inc. for the Agreement. Accordingly, Barnum may be considered a third-party beneficiary to the Agreement.

### B. *Barnum's Claim is Time Barred by the Agreement's Internal Limitations Period*

■ Pursuant to the terms of the Agreement, the promisee, Greer–Woodycrest, had to bring a claim for breach of warranty within 15 months of closing, that is, by March 21, 1992. *See John J. Kassner & Co. v. City of New York*, 46 N.Y.2d 544, 550–51, 415 N.Y.S.2d 785, 389 N.E.2d 99 (1979) (holding parties may contractually agree to a shorter statute of limitations than that which is prescribed by law).

■ A third-party beneficiary does not have greater rights than the promisee under the agreement sued upon. *See National Benefit Fund for Hosp. & Health Care Employees v. Presbyterian Hospital in New York, Inc.*, 448 F.Supp. 136, 138 (S.D.N.Y. 1978). Since the promisee, Greer–Woodycrest can no longer enforce the covenant to repay the terminated residents under the Agreement's internal 15 months statute of limitations, the third-party beneficiary, in this case Barnum, is also time barred under

the Agreement's internal limitations period. *See Krugman & Fox Constr. Corp. v. Elite Assoc., Inc.*, 167 A.D.2d 514, 515, 562 N.Y.S.2d 188 (2d Dept.1990) (shorter statute of limitations agreed to by primary parties binds third-party beneficiary), *appeal denied*, 77 N.Y.2d 806, 568 N.Y.S.2d 913, 571 N.E.2d 83 (1991).

Accordingly, Barnum's claims under, and rights to enforce, the Agreement are time barred.

### C. *The Terms of the Note Are Binding*

■ Barnum's breach of contract claim presumes that, as a third-party beneficiary under the Agreement, she has greater rights under the Agreement than under the subsequent Consent Form she signed and its ensuing Note. Notwithstanding the fact that Barnum is a third-party beneficiary under the Agreement, she is bound by the terms of the Consent Form, agreeing to the terms of the Note, that she subsequently signed.

As an initial matter, the terms of the Consent Form and Note are consistent with the terms of the Agreement. The Agreement does not create a fully recourse right of terminated residents against the Purchaser. The Agreement provides that "repayments are to be made from funds paid to Purchaser as the loan portion of the entrance fees paid under the New Residency Agreement entered into after the Closing Date with respect to units of the Retirement Community which were subject to no Residency Agreement or to Residency Agreements with Terminating Residents, as of the Closing Date (the 'Repayment Funds')." (Agreement § 8.15.) Under this provision the "[p]urchaser's obligation to make such payments shall be secured by a lien on the RC Parcel." *Id.* The Agreement also states that the Purchaser is unconditionally bound to repay the terminated residents the amount owed to them by Greer–Woodycrest.

Both the Note and the Agreement provide that repayment is to be made from funds paid by new residents for units that were in the process of being vacated or already vacated by the terminated residents as of the closing date. Both the Note and the Agreement provide that the security for the Note is the right of reacquisition of Greercrest. Finally, the Note explicitly provides that it is a non-recourse note[6] against the maker. Nowhere is there a expressed intent to benefit Barnum beyond the obligations outlined in the executed Consent Form and ensuing Note.

■ Courts must interpret contracts in accordance with a reasonable interpretation of their terms. *See, e.g., Carmeuse v. M.J. Stavola Indus., Inc.*, 823 F.Supp. 125, 128 (S.D.N.Y.1993); *Sutton v. East River Savs. Bank*, 55 N.Y.2d 550, 554–56, 450 N.Y.S.2d 460, 435 N.E.2d 1075 (1982). Here, there is no provision or indication in the Agreement that the Purchaser would provide full recourse notes in order to repay the terminated residents. Moreover, the documents executed only a month after the Agreement all explicitly provide that Millbrook's obligations to the terminated residents are non-recourse.

■ Contemporaneous agreements and documents are to be evaluated when assessing the extent of the Barnum's third-party beneficiary rights under the Agreement. *See BWA Corp. v. Alltrans Express U.S.A., Inc.*, 112 A.D.2d 850, 852, 493 N.Y.S.2d 1 (1st Dept.1985); *Flemington Nat'l Bank & Trust Co. (N.A.) v. Domler Leasing Corp.*, 65 A.D.2d 29, 32–33, 410 N.Y.S.2d 75 (1st Dept.1978), *aff'd*, 48 N.Y.2d 678, 421 N.Y.S.2d 881, 397 N.E.2d 393 (1979). A review of the language of the documents executed only a month after the Agreement—Barnum's Note, the Consent Form she filled out, and the Second Amendment to the Offering Plan (which included the Consent Form and the Notes in its attachments)—reveals that the obligations were non-recourse.[7]

---

6. A non-recourse loan is defined in Black's Law Dictionary as: "Type of security loan which bars the lender from action against the borrower if the security value falls below the amount required to repay the loan." *Black's Law Dictionary* 953 (5th ed. 1979).

7. In her *Amended Complaint*, Barnum contends that she should not be bound by the terms of the Note because she was unaware of the Agreement when she signed the note. Under this theory, Barnum would have to be considered a creditor beneficiary of the Agreement. *See Bell v. Lon-*

■ It is well established that a subsequent contract regarding the same matter will supersede the prior contract. *See College Auxiliary Servs. of State Univ. College, Inc. v. Slater Corp.*, 90 A.D.2d 893, 894, 456 N.Y.S.2d 512 (3d Dept.1982). Here, Barnum assented to the modification of the contract to which she was a third-party beneficiary when she signed the Form Consent agreeing to the Note. As a result, the terms of the Note supersede any third-party beneficiary rights Barnum may have had under the Agreement.

■ Additionally, the parties to an agreement may subsequently modify the agreement even without the consent of the creditor beneficiary as long as the creditor beneficiary has not accepted, adopted or relied upon the original agreement. *See Worldwide Sugar Co. v. Royal Bank of Canada*, 609 F.Supp. 19, 24 (S.D.N.Y.), *aff'd*, 751 F.2d 373 (2d Cir.1984); Restatement [Second] of Contracts §§ 311(2), (3) (1979).[8] Under either theory, Barnum's consent to the Note, and its resultant modification of the original Agreement, must be binding.

For the reasons set forth above, Barnum is bound by the terms of the Note and her breach of contract claim is dismissed.

## II. Barnum's Fraud Claim Must Fail

Barnum's second claim is rooted in common law fraud. "The elements of common law fraud are a material, false representation, an intent to defraud thereby, and rea-

sonable reliance on the representation causing damage to the plaintiff." *Kregos v. Associated Press*, 795 F.Supp. 1325, 1334 (S.D.N.Y.1992) (citing *Katara v. D.E. Jones Commodities Inc.*, 835 F.2d 966, 970–71 (2d Cir.1987)), *aff'd*, 3 F.3d 656 (2d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1056, 127 L.Ed.2d 376 (1994); *Zaro Licensing, Inc. v. Cinmar, Inc.*, 779 F.Supp. 276, 284 (S.D.N.Y.1991) (citing same). For the reasons set forth below, Barnum fails to adequately plead the elements necessary to sustain her fraud claim.

### A. Many of Barnum's Allegations Are Irrelevant

Only two of Barnum's allegations, concerning Reis' letter of November 1991, can be considered relevant to her fraud claims. The other allegations, as described immediately below, are irrelevant to her common law fraud claim and must be dismissed out of hand.

#### 1. Irrelevant Allegations of Fraud

First, Barnum complains that the Second Amendment does not adequately describe the non-recourse provisions of the Note. This allegation cannot be seriously considered as a copy of the exact Note that she signed was attached to the Second Amendment she concededly reviewed. In addition, nothing in the Second Amendment states that the Note is fully recourse. Therefore, there could not have been any misrepresentation.[9]

---

don, 580 F.Supp. 62, 63 (S.D.N.Y.1984); *Ambrose Mar–Elia Co. v. Dinstein*, 151 A.D.2d 416, 418, 543 N.Y.S.2d 658 (1st Dept.1989), *appeal denied*, 74 N.Y.2d 615, 549 N.Y.S.2d 960, 549 N.E.2d 151 (1989); Restatement [Second] of Contracts § 302 Comment (b) (1979). However, this supposition does not help Barnum as a creditor beneficiary's rights do not mature until the creditor accepts, adopts, or relies on the contract. *Worldwide Sugar Co. v. Royal Bank of Canada*, 609 F.Supp. 19, 24 (S.D.N.Y.), *aff'd*, 751 F.2d 373 (1984). In this case, Barnum admits that she had no knowledge of the Agreement at the time she signed the Consent Form for the Note, (Amended Compl. ¶ 20), as a result, Barnum did not have any rights under the Agreement when she signed the Consent Form to obtain the Note.

8. *Fleet Nat'l Bank v. Trans World Airlines, Inc.*, 767 F.Supp. 510 (S.D.N.Y.1991), cited by Bar-

num, is not inapposite as the underlying indentures at issue in the case had explicit contractual provision stating that they could not be modified without the consent of the third-party beneficiaries once they had relied on the relevant provisions of the indentures.

9. Further, the Second Amendment is subject to regulation by the Attorney General of the State of New York under the Martin Act, N.Y.Gen.Bus. Law §§ 352 *et seq.* (McKinney's 1984), which requires that the Attorney General must accept the form of the amendment before its filing. Here, the Attorney General consented to the form of disclosure. Any objection that Barnum had to the wording of the Second Amendment should have been raised within four months after the Second Amendment was accepted by filing an Article 78 proceeding against the Attorney General. *See Eagle Tenants Corp. v. Fishbein*, 182 A.D.2d 610, 611, 582 N.Y.S.2d 218 (2d Dept.

Second, Barnum's contention that the December 26, 1990 Millbrook Meadows "Restated Offering Plan" does not give notice of Plaintiff's right to the return of her entry fee is irrelevant to her fraud claim as it is an offering plan for prospective purchasers—and contains no indication that it affects terminated residents such as Barnum. In addition, the "Restated Offering Plan" was filed well after Barnum had consented to her Note and consequently could have had no possible impact on her decision to accept the nonrecourse Note.

Third, Barnum concedes that although her Note was non-recourse, the Declaration of Covenants, Restrictions, Conditions and Reacquisition, (Am.Compl.Ex. F), does not repeat the non-recourse language. However, Barnum has not indicated that the language contained in this document is false or perpetrates a fraud in a manner sufficient to sustain a common law fraud claim.

Fourth, Reis' choice of wording (i.e. "prepay" and "prepayment" in lieu of "repay" and "repayment") in his letter seeking amendment to the Note cannot adequately sustain a fraud claim, especially in light of Barnum's concession that "[i]t is unclear at this stage ... whether or not ... the repeated erroneous use of the word *prepay* for *repay* was merely poor grammar on Reis' part or wilful obfuscation." (Am.Compl. ¶ 35.)

Fifth, Barnum alleges that the information that she received, after having already agreed to the modification of her Note, about the number of terminated residents ahead of her was fraudulently misleading. (Am. Compl. ¶¶ 39, 40.) However, according to the Amended Complaint, Barnum received the information that $679,150 had to be paid out before her turn to be repaid arose. This statement does not appear to be a fraudulent misrepresentation, rather simply another way to answer the same question, and accordingly, this claim has no merit.

Sixth, Barnum asserts that on December 12, 1992 the Defendants set forth a "bleaker financial picture" than they had the previous year in their December 12, 1991 letter. (Am.

1992). Accordingly, this claim is also time-barred, *see* N.Y.C.P.L.R. § 217, and irrelevant to

Compl. ¶ 41.) As Barnum has not alleged that either statement is false, a claim of common law fraud on this assertion simply cannot prevail. Likewise, the Plaintiff's conclusory allegation that the sum of the foregoing activities make up a "fraudulent scheme," (Am.Compl. ¶ 43), cannot prevail in the absence of any individual fraudulent acts.

### 2. *The November, 1991 Letter*

The only allegedly false statements made by the Defendants appears to be in their letter of November 1991 which requested the modification of the Note to allow Millbrook to use Vacant Pooled Funds to pay interest, and not just principal, as was initially intended.

█ Barnum contends that Millbrook's characterization that the modifications to the Note were "slight" constitutes fraud. However, aside from this characterization, the text of the letter quoted in the Amended Complaint appears to describe all the changes sought by the Defendants. Hence, the characterization, that the proposed modifications were "slight," is merely a non-actionable opinion and does not constitute a material misrepresentation of fact. *See Zaro Licensing, Inc. v. Cinmar, Inc.,* 779 F.Supp. 276, 284 (S.D.N.Y.1991); *Hershfang v. Citicorp,* 767 F.Supp. 1251, 1256 (S.D.N.Y.1991); *cf. Friedman v. Mohasco Corp.,* 929 F.2d 77, 79 (2d Cir.1991) (finding statements about future events that are expressions of opinions and not guarantees are not actionable under federal securities fraud statute).

█ Barnum's second allegation concerning the November 1991 letter is that Reis falsely represented that Robert Levine was Barnum's attorney when, in fact, Levine was the attorney for the Millbrook Resident Association. However, this claim may not prevail as Barnum does not establish in the Amended Complaint that she relied on Reis' assertion that Levine was her attorney.

Further, even if she was "induced" to agree to the modification of her Note based on this alleged misrepresentation, she does not indicate how such reliance would have

the fraud claim.

been justified. *Royal Am. Managers, Inc. v. IRC Holding Corp.,* 885 F.2d 1011, 1016 (2d Cir.1989); *Burke v. Bevona,* 866 F.2d 532, 539 (2d Cir.1989); *Lanzi v. Brooks,* 54 A.D.2d 1057, 1058–59, 388 N.Y.S.2d 946 (1976), *aff'd,* 43 N.Y.2d 778, 402 N.Y.S.2d 384, 373 N.E.2d 278 (1977).

Aside from the fact that presumably Barnum would know the identity of her own attorney, Barnum's allegedly justified reliance is obviated by Reis' statement that Levine "does not object to the form of the amendment, although the decision as to whether or not to accept it is, of course, up to you." (Am.Compl. ¶ 36.). Further, the plain language of this statement indicates merely that Levine approved the "form" and not necessarily the substance of the modification. In any event, Reis clearly states that Barnum is free to accept or reject the modification, hence justifiable reliance is not adequately alleged by the Amended Complaint. *See 225 W. End Ave. Assocs. v. Bittorf,* 744 F.Supp. 67, 71 (S.D.N.Y.1990) (finding that plaintiff's reliance on misrepresentations by defendant in an unsuccessful application to the New York Attorney General for approval to convert premises to a cooperative/condominium was unjustified).

Accordingly, Barnum's claim for common law fraud, is dismissed pursuant to Fed. R.Civ.Pro.Rule 12(b)(6).

### III. Emotional Distress/Prima Facia Tort Claim

■ Barnum's final claim realleges the prior paragraphs of the complaint and states that "[b]y reason of the [Defendants'] foregoing acts, Plaintiff has been subjected to intense distress and mental suffering" and should be awarded $1,000,000. No further elucidation of her distress and mental suffering, and its etiology, is described by the Amended Complaint.

■ Under New York law, the four elements required to state a claim for intentional infliction of emotional distress are:

(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and the injury; and (iv) severe emotional distress.

*Howell v. New York Post Co.,* 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993). In this case Barnum has failed to even minimally establish two of the four elements necessary to sustain a claim of intentional infliction of emotional distress—outrageous conduct or Defendants' intent to cause emotion distress.

As a preliminary matter, it must be noted that the New York Court of Appeals has never found a case in which the conduct complained of was sufficiently outrageous in character to state a claim for intentional infliction of emotion distress. *See Howell,* 81 N.Y.2d at 122, 596 N.Y.S.2d 350, 612 N.E.2d 699. Nevertheless, outrageous conduct is defined to be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Murphy v. American Home Prods. Corp.,* 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983) (quoting Restatement [Second] of Torts § 46, comment d (1979)); *see also Piesco v. City of New York Dep't of Personnel,* 753 F.Supp. 468, 479 (S.D.N.Y.1990), *aff'd in part, rev'd in part and remanded on other grounds,* 933 F.2d 1149 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991).

Here, the failure or inability of Millbrook to pay the entire amount of its obligations under a non-recourse Note, while unfortunate, does not constitute, as a matter of New York law, conduct which may be deemed outrageous or beyond the possible bounds of decency. Accordingly, Barnum has not adequately alleged outrageous conduct necessary to sustain this claim.

Second, Barnum has not pleaded sufficient facts to allege that any of the Defendants intended to cause her severe emotional distress—or such disregard which has the probability of causing severe emotional distress. Millbrook, at worst, was selfishly pursuing its own business interests at Barnum's expense. "If a defendant's primary purpose was to advance its own business interests, and any conduct that harmed plaintiff was incidental, defendant has not committed the New York

tort of intentional infliction of emotional distress." *Preston v. Martin Bregman Prods., Inc.,* 765 F.Supp. 116, 120 (S.D.N.Y.1991) (quoting *Rooney v. Witco Corp.,* 722 F.Supp. 1040, 1045 (S.D.N.Y.1989)); *see also Martin v. Citibank N.A.,* 762 F.2d 212, 220 (2d Cir. 1985).

Therefore, Barnum's claim of intentional infliction of emotional distress may not prevail and is dismissed.

Barnum likewise cannot sustain a claim of prima facie tort which, under New York law, also consists of four elements: (1) infliction of intentional harm, (2) without excuse or justification, (3) by an act or series of acts which would otherwise be lawful, (4) resulting in special damages. *Burns Jackson Miller Summit & Spitzer v. Lindner,* 59 N.Y.2d 314, 332, 464 N.Y.S.2d 712, 451 N.E.2d 459 (1983); *WFB Telecommunications, Inc. v. NYNEX Corp.,* 188 A.D.2d 257, 258, 590 N.Y.S.2d 460 (1st Dept.1992).

As with the intent requirement for intentional infliction of emotional distress, if a defendant's motive is tainted by self interest, profit or business advantage, a prima facia tort action cannot be sustained. *See Burns Jackson Miller Summit & Spitzer v. Lindner,* 59 N.Y.2d 314, 332, 464 N.Y.S.2d 712, 451 N.E.2d 459 (1983). Here, the facts alleged by Barnum in the Amended Complaint indicate that the Defendants were motivated by their own financial interests and not "disinterested malevolence." *Id.* (citing *American Bank & Trust Co. v. Federal Bank,* 256 U.S. 350, 358, 41 S.Ct. 499, 500, 65 L.Ed. 983 (1921) (Holmes, J.)); *Bassim v. Hassett,* 184 A.D.2d 908, 909, 585 N.Y.S.2d 566 (3d Dept.1992). Under either label, Barnum has not stated a claim for relief and, accordingly, her third cause of action is dismissed.

## Conclusion

Although this is Plaintiff's second opportunity to amend her complaint, after viewing the Defendants' briefing of the deficiencies in the original Complaint, she has yet to adequately amend her complaint to withstand dismissal under Rule 12(b)(6). As a result, a dismissal of her Amended Complaint with prejudice is appropriate. *See, e.g., Armstrong v. McAlpin,* 699 F.2d 79, 93–94 (2d Cir.1983) (dismissing second amended complaint with prejudice); *Sendar Co., Inc. v. Megaware, Inc.,* 705 F.Supp. 159, 163 (S.D.N.Y.1989) (denying leave to replead); *Avnet, Inc. v. American Motorists Insurance Co.,* 684 F.Supp. 814, 816 (S.D.N.Y.1988) (same).

Accordingly, for the reasons set forth above, Barnum's Amended Complaint is dismissed with prejudice.

It is so ordered.